CITY OF NEWTON & another[1] *vs.* DEPARTMENT OF PUBLIC UTILITIES & others.

Suffolk. June 12, 1959. — July 3, 1959.

Present: WILKINS, C.J., SPALDING, COUNIHAN, WHITTEMORE, & CUTTER, JJ.

*Railroad*, Service. *Public Utilities. Equity Jurisdiction*, Review of decision of department of public utilities. *State Administrative Procedure Act. Equity Pleading and Practice*, Parties. *Words*, "Aggrieved party in interest."

A proceeding before the department of public utilities on a petition by a railroad under G. L. c. 160, §§ 128, 128A, for approval of abandonment of stations and discontinuance of trains and stops was an adjudicatory proceeding in which the procedure before the department was governed by the State administrative procedure act, G. L. c. 30A. [542]
The standing of one to seek judicial review of a decision made by the department of public utilities in an adjudicatory proceeding respecting

---

[1] Newton Improvement Association. The other defendants are the railroads mentioned in the opinion.

railroad service under G. L. c. 160, §§ 128, 128A, was governed by G. L. c. 25, § 5, as amended through St. 1956, c. 190. [543]

Discussion of authorities in connection with the words "an aggrieved party in interest" in G. L. c. 25, § 5, as amended through St. 1956, c. 190. [543–544]

The standing of a city as "an aggrieved party in interest" under G. L. c. 25, § 5, as amended through St. 1956, c. 190, to seek judicial review by a petition in this court of a decision by the department of public utilities under G. L. c. 160, §§ 128, 128A, approving a railroad's abandonment of stations and discontinuance of trains and stops did not appear from the city's petition, and a demurrer thereto must be sustained, where its allegations did not show either that the city had been allowed to intervene as a party before the department or that the city had been unlawfully refused permission to intervene. [544]

Questions of regulatory policy and fact respecting the service furnished by a railroad, not involving constitutional issues, are to be determined, in accordance with pertinent statutes, by the department of public utilities and not by the courts. [545]

In dealing with applications for approval of changes in the service furnished by a railroad, the standard to be applied by the department of public utilities is that of the public convenience and necessity determined broadly after a consideration of all relevant factors, including the overall service of the railroad, general transportation conditions affecting the railroad and other railroads, financial matters, and the availability of other forms of transportation. [546–548]

In a proceeding before the department of public utilities by a railroad for approval of discontinuance of certain local service, a ruling made by the department that there must be a broad determination of public convenience and necessity "not to be influenced by purely local considerations" meant merely that the "purely local considerations," although to be taken into account, must not be given controlling weight. [548]

The record of a proceeding before the department of public utilities on an application by a railroad for approval of a proposed discontinuance of all passenger service at a certain suburban station near Boston, although it was used by several hundred passengers daily, and discontinuance of several suburban trains and stops of other trains, substituting certain stops of trains operated between Boston and a more distant point, disclosed no error of law in a decision by the department approving the proposal as consistent with the public convenience and necessity broadly viewed in the interest of the overall passenger service of the railroad. [548–549]

PETITION, filed in the Supreme Judicial Court for the county of Suffolk on April 23, 1959.

The case was reserved and reported by *Cutter*, J., without decision.

The case was submitted on briefs.

*Matt B. Jones, Jr.,* City Solicitor, for the city of Newton.

*Richard H. Lovell & David B. Eusden,* for Newton Improvement Association.

*Edward J. McCormack, Jr.,* Attorney General, *Nathan S. Paven,* Assistant Attorney General, *& Herbert Baer,* for the Department of Public Utilities.

*Richard J. Ferriter,* for Boston and Albany Railroad Company and another.

CUTTER, J. The city of Newton and Newton Improvement Association seek review under G. L. c. 25, § 5 (as amended through St. 1956, c. 190),[1] of a decision of the department of public utilities (the department) authorizing (a) the abandonment by the Boston and Albany Railroad Company and by its lessee, the New York Central Railroad Company (hereinafter together called the railroads), of several passenger stations, and (b) the discontinuance of certain trains and of stops of other trains. The department and the railroads demurred and answered. A single justice reserved the case without decision upon the petition, the demurrers, the answers, and the complete record before the department for the decision by the full court of the questions of law thereby presented.

The railroads asked to discontinue six trains eastbound and four trains westbound between South Station and River-

---

[1] Section 5 reads, "When so requested by *any party interested,* the commission shall rule upon *any question of substantive* law properly arising in the course of any proceeding . . . and *any party interested aggrieved* by such ruling may object thereto, and *may secure a review* as hereinafter provided. . . . An appeal *as to matters of law* from any final decision . . . of the commission may be taken to the supreme judicial court by *an aggrieved party in interest* by the filing of a written petition praying that the order of the commission be modified or set aside in whole or in part. . . . Each claim of appeal shall set forth . . . each *error of law* asserted to have been made . . . . Upon the entry of the appeal it shall be . . . determined by the court, which shall have jurisdiction to affirm, modify or set aside such decision . . . of the commission in whole or in part, or remand the proceeding . . . with instructions subject to review by the full court upon appeal. Any order of the department . . . may be enforced according to its terms and enforcement thereof shall not be suspended or stayed by the entry of an appeal therefrom. . . . The burden of proof shall be upon the appealing party to show that the decision . . . appealed from is invalid. No evidence beyond that contained in the record shall be introduced before the court, except that in cases where issues of confiscation or of constitutional right are involved the court may order such additional evidence as it deems necessary for the determination of such issues to be taken before the commission . . ." (emphasis supplied).

side, substituting stops at Riverside and intermediate stations (so far as not to be abandoned) by trains running between Framingham and South Station. Some of these trains would operate "on a so called 'skip-stop' arrangement under which . . . [they] will omit a stop at every other station, which . . . in turn will be served by the next succeeding train."[1] The railroads also sought discontinuance of all service at Newton station near Newton Corner so called (and certain other stations here not in controversy). The petition for review (a) requests that the department's decision be set aside in the respects in which it affects the city of Newton, and (b) asserts error in the denial and granting of requests for rulings.

The decision includes the following findings. The discontinuance of other "rush-hour trains . . . in the light of the alternative service which is proposed" will result in "[s]ome reduction in the . . . trains stopping at" various stations from Newtonville west, but "the service . . . to be continued . . . will be such that all of the passengers now using the trains during rush hours will have trains available . . . which will permit them to arrive [at] and depart from Boston at substantially the same times" as at present. For these stations "[f]requent service will still be available. In many cases the service will be faster . . . and in almost every case a train will be available within five to ten minutes earlier or later than the trains . . . to be discontinued." Riverside "will no longer be used as a transfer point, and commencing in July, 1959, frequent MTA [Metropolitan Transit Authority street car] service will be available" there.

There also "is alternative MTA service near the Newton station. . . . Newtonville station, where frequent railroad service will still be available, is approximately one mile from the Newton station. Many people today make the trip from their home[s] to the station by automobile and the addi-

---

[1] "The skip-stop arrangement provides a more even spacing of trains . . . and eliminates . . . stops at certain stations . . . sometimes [only] two or three minutes apart." It would also "eliminate . . . dead-head movements between Riverside and Boston."

tional travel to Newtonville will not seriously inconvenience them. . . . [N]o fixed rule . . . requires that a station be available to patrons less than one or even two miles from their homes. Many people today travel greater distances to . . . railroad service. . . . [T]he riding habits of the public have changed measurably in recent years. The public and the railroad service must be mutually adjusted to these changing travel patterns. While the passengers using the Newton station may no longer enjoy an unusually advantageous position, the availability of railroad service or alternative forms of public transportation will continue at least to be equal to that of a great number of other people presently using railroad service. Considering the interests of all the railroad's suburban passengers . . . public convenience and necessity would not be served by requiring the railroad to continue to serve the Newton" station, although approximately four hundred people use it each day in each direction.

"Since 1952 when . . . [New York Central] earned a net income of $52 million its earnings have deteriorated steadily. In 1957 its net income was approximately $8.4 million and for the eleven months ending November 30, 1958, it showed a deficit from operation in excess of $1 million. Subsequent unaudited figures for the full year . . . showed a net income of . . . $4 million, but this figure included . . . $13 million of retroactive mail payments . . . attributable to prior years. . . . [T]he passenger service is operating at a considerable deficit . . . [which] appears to be . . . increasing . . . . A higher proportion of the freight income is required to absorb the passenger deficit. This proportion reached 64% in 1957. The number of commutation passengers carried on the . . . Central System . . . decreased by approximately 36% between 1947 and 1957 and by 4.26% between 1952 and 1957. During the same periods commutation revenues have, nevertheless, increased due to . . . fare increases . . . . Within the Boston and Albany division commutation passengers . . . decreased from 3.1 million in 1952 to 2.8 million in 1957 . . . . Moreover, in

1958 2.4 million passengers were carried, a decrease of over 400,000 passengers from the preceding year. When this information is evaluated . . . with the fact that a fare increase . . . was recently made applicable to commutation travel on the . . . division, these figures suggest that fares may have reached a level which will no longer permit the railroad to maintain or increase passenger revenues by . . . further fare increases, since any substantial fare increase appears likely to cause a serious decline in the number of passengers carried, which may offset in large part the revenue increase expected to result."

The department estimated that the "net annual saving from the grant of the petition" would be $77,665 even if all the Newton station "passengers no longer ride the railroad" so that the total revenue ($87,001 in 1958 projected to present fare levels) from Newton passengers is lost. If all or a portion of the Newton passengers go to Newtonville to take the train the savings would be greater.

The department ruled that the "mere fact that the railroad could effect some savings if the petition were allowed, is not in itself a sufficient ground for permitting the discontinuance of service," but that the department "must judge whether public convenience and necessity requires . . . continuation of the service." The decision pointed out, "however, that in a period of declining patronage and increasing costs, railroad passenger travel in its entirety is threatened. Economies in operating . . . should be encouraged in order that essential service can be preserved. The convenience resulting from the operation of any particular trains or the stopping at particular stations must be evaluated within the context of the entire passenger service. When so viewed, there may be instances where the discommoding of some passengers is necessary in order that service to the many may be preserved."

The decision reviewed the evidence showing that, apart from minor "savings resulting from the discontinuance of . . . five stations [including Newton station], the major objective was the improvement of the service rendered to

passengers from Newtonville . . . and . . . stations west of
Newtonville. . . . All of these [five] stations are within
very short distance of MTA service. . . . If we were to
decide cases . . . on the basis that it cost the railroad noth-
ing to stop a train, we could be . . . requiring the railroad
to stop so frequently that its service would approximate a
local transit service. Such frequent stopping is not fair to
the great majority of passengers who must ride long dis-
tances . . . and who have no alternative transportation.
Railroad commutation service depends on the road being
able to retain its present patronage . . . wherever the serv-
ice is essential and perhaps to attract additional patronage
in the longer haul category."

1. The department has broad general power of regulation
of carriers, including railroads. G. L. c. 159, §§ 10, 12 (a)
(as amended through St. 1945, c. 175), §§ 13, 16, 16A, 24,
105; also c. 160, §§ 128 (as amended through St. 1922,
c. 116), 128A (inserted by St. 1957, c. 159),[1] and 129. Un-
der c. 159, § 12, the department is given "general super-
vision and regulation of . . . the following services, when
furnished . . . for public use within the commonwealth,"
including "(a) [t]he transportation . . . of persons or prop-
erty . . . between points within the commonwealth by rail-
roads." By § 16, the department is given power after
hearing, if in its "opinion . . . the regulations . . . or serv-
ice of any common carrier are . . . inadequate," to determine
the "service thereafter to be used,"[2] and, by § 16A, the "de-

---

[1] Chapter 160, § 128, reads, "A railroad corporation which has . . . main-
tained a passenger station . . . for five consecutive years . . . shall not
abandon such station . . . nor substantially diminish the accommodation fur-
nished by the stopping of trains thereat as compared with that furnished at
other stations on the same railroad, except with the written approval of the
department after notice posted . . . for a period of thirty days immediately
preceding a public hearing thereon." Section 128A reads, "A railroad cor-
poration which has . . . operated a passenger train on a regular schedule for
twelve consecutive months . . . shall not discontinue the operation of such
train or cut out more than ten per cent of its station stops, except with the
written approval of the department after public hearing, notice of which hear-
ing . . . shall be posted . . . at the stations involved for a period of fifteen
days . . . preceding said . . . hearing. . . ." No contention is made, or
reasonably could be made, that the action of the department constitutes a
relocation of a passenger station under § 129.

[2] The regulatory powers of the department over intrastate service have
been substantially affected by Pub. L. 625, 85th Congress, 2d Sess., enacted

partment before authorizing any railroad to discontinue . . . any . . . lines, stations or . . . service, may consider, in addition to other facts, the revenues of said railroad from all sources."

2. The demurrers present the question whether the petitioners have standing to seek judicial review of the department's decision under G. L. c. 25, § 5, as amended, or under G. L. c. 30A, §§ 1 (1), 1 (3), 10 and 14 (as amended through St. 1957, c. 193, § 1).[1]

Procedure before the department is now governed by the State administrative procedure act found in G. L. c. 30A. See St. 1955, c. 285, § 1, amending G. L. c. 25, § 4. See also 1955 Annual Survey of Mass. Law, §§ 13.1, 15.17. Since "legal rights . . . of specifically named persons" (the railroads) were required to be determined (under c. 160, §§ 128 and 128A) after hearing, the department hearings were "adjudicatory proceedings" under c. 30A, § 1 (1), at least as to the railroads. See *Norwood Ice Co.* v. *Milk Control Commn.* 338 Mass. 435. Cf. *Hayeck* v. *Metropolitan Dist. Commn.* 335 Mass. 372, 373, 375; *Natick Trust Co.* v. *Board of Bank Incorporation,* 337 Mass. 615, 617; *Allied Theatres of New England, Inc.* v. *Commissioner of Labor & Ind.* 338 Mass. 609.

The transcript of testimony before the department (but not the city's petition in this court) shows that the department did permit the city by counsel to participate in the hearing, to cross-examine witnesses, and to argue. It is not clear, however, whether this was intended to constitute

August 12, 1958, inserting 49 U. S. C. § 13a. Section 13a (2) gives to the Interstate Commerce Commission power to act upon discontinuances of or changes in the operation or service of any intrastate train under certain circumstances more fully stated in the section. See Sen. Rep. No. 1647, June 3, 1958; House Rep. No. 1922, June 18, 1958; Conf. Rep. No. 2274, July 24, 1958. U. S. Code Cong. & Adm. News 1958, pp. 3456–3489, esp. pp. 3486–3488. Cf. restriction on authority of the lower Federal courts to affect intrastate regulation stated in *Alabama Pub. Serv. Commn.* v. *Southern Ry.* 341 U. S. 341, 345–351.

[1] The city of Newton filed a brief with Newton Improvement Association, which we assume (although it is not clear from the record) to be an unincorporated association. The city and the association filed the same requests for rulings. Accordingly, it is not necessary to discuss whether the association, as distinguished from individual members, had standing either to intervene before the department or to seek review.

allowance of formal intervention under § 10 (4),[1] under which the department has discretion either (a) to admit appropriate interveners for the protection of proper interests (see the power of this court in equity proceedings, *Boston Real Estate Bd.* v. *Department of Pub. Util.* 334 Mass. 447, 482), or (b) to refuse to permit intervention.

Even if we assume that the city properly became an intervener before the department, the administrative procedure act (c. 30A) does not control the question of standing to seek review of decisions of the department, for c. 25, § 5, expressly limits such standing to "an aggrieved party in interest."[2] There has long been uncertainty about the persons within that description. In *Donham* v. *Public Serv. Commrs.* 232 Mass. 309, 328–329, it was suggested that "public interests are entrusted to the Attorney General," but in *Fall River* v. *Public Serv. Commrs.* 232 Mass. 329, a proceeding by a city to review a departmental decision was dismissed on the merits without mention of the city's standing, as to which in the *Donham* case it was said that it had "not been contended that . . . [the city] may not itself bring a petition." See *A. B. & C. Motor Transp. Co.*

---

[1] Section 10 (4) provides that "agencies may . . . (4) allow any person showing that he may be substantially and specifically affected by the proceeding to intervene as a party to the whole or any portion of the proceeding and allow any other interested person to participate by presentation of argument orally or in writing, or for any other limited purpose as the agency may order." The discretion to limit intervention was obviously intended to permit the department to control the extent of participation by persons not sufficiently and specifically interested to warrant full participation, which might interfere with complicated regulatory processes. See 1954 Annual Survey of Mass. Law, § 14.11. We need not decide to what extent there may be judicial review of the exercise of this discretion (see *Eno* v. *Prime Mfg. Co.* 314 Mass. 686, 703) or whether this court, under c. 25, § 5, or c. 30A, or under general equitable principles (see discussion in *D. J. Doyle & Co. Pty. Ltd.* v. *Darden,* 328 Mass. 288, 290–292; see also *Bolster* v. *Attorney Gen.* 306 Mass. 387, 389–391), may refuse to entertain a petition for judicial review by a person improvidently allowed to intervene generally before the department.

[2] Chapter 30A, § 14, provides, as to judicial review, that where "a statutory form of judicial review . . . is provided, other than by extraordinary writ, such statutory form shall govern in all respects, except as to standards for review. . . . In so far as the statutory . . . review . . . is silent as to procedures provided in this section, the provisions of this section shall govern such procedures." Accordingly, except as to the standards of review, found in c. 30A, § 14 (8), review of the decisions of the department is governed by c. 25, § 5, to the extent that § 5 contains a provision (as it does as to standing) relating to the particular aspect of review under consideration.

*Inc.* v. *Department of Pub. Util.* 327 Mass. 550, 551. In
*Flynn* v. *Department of Pub. Util.* 302 Mass. 131, 134–135,
*Malden* v. *Metropolitan Transit Authy.* 328 Mass. 491, 492,
*New Bedford* v. *New Bedford, Woods Hole, Martha's Vine-*
*yard & Nantucket S.S. Authy.* 329 Mass. 243, 248, *Natick*
*Trust Co.* v. *Board of Bank Incorporation,* 337 Mass. 615,
617, and *Retail Stores Delivery, Inc.* v. *Department of Pub.*
*Util., ante,* 441, 443, the question of standing to seek com-
parable review either was not decided or was not dis-
cussed. *American Can Co. of Mass.* v. *Milk Control Bd.*
313 Mass. 156, 160–162, contains language which tends to a
broad interpretation of statutory words defining standing
for purposes of judicial review of administrative decisions.
The *American Can Co.* case, however, arose under a statute
(G. L. c. 94A, § 21, inserted by St. 1941, c. 691, § 2) giving
a right of review to "[a]ny person aggrieved," whereas § 5
gives a right of review only to "an aggrieved *party in inter-*
*est*" (emphasis supplied). See also Davis, Administrative
Law (1958 ed.) §§ 22.01–22.18 esp. §§ 22.05–22.06.

We need not decide whether, under the provisions and
principles which have just been discussed, the city could
properly have been treated as a formal intervener for all
purposes before the department. The city's petition in this
court does not allege facts which show either (a) that the
department did in fact exercise any discretion which it may
have had under c. 30A, § 10 (4), to admit it as such an inter-
vener, or (b) that, as a matter of law, the city was entitled
to intervene before the department and was refused that
right. In the absence of allegations showing that the city
was properly a party before the department and had an
interest sufficient to make it "aggrieved," or was unlawfully
refused permission to become a party, the city has not made
allegations which, if sustained in the record before the de-
partment, would establish standing to seek review under
c. 25, § 5. The demurrers must be sustained.

3. We proceed to a consideration of the merits of the case
because of the possibility that the city and the association
may seek to amend their petition and because of the am-

biguity of the department's action with respect to permitting them to be heard before it. Upon the merits, also, they could not prevail.

In a case like this where no constitutional issues (see *Opinion of the Justices,* 328 Mass. 679; cf. *Lowell Gas Co.* v. *Department of Pub. Util.* 324 Mass. 80, 86) are directly involved, the department (not the courts) is to determine, in accordance with the statutes cited, questions of regulatory policy and fact. The department's determination is subject to review (under G. L. c. 25, § 5) by this court "as to matters of law."

The principal contentions of the city and the association are (a) that the department "failed properly to evaluate the public convenience . . . with respect to passengers to and from Newton station," and (b) that there was "no showing of loss from the operation of the trains" and service under discussion. It is also contended that the department incorrectly granted rulings sought by the railroads, and improperly denied six requests of the city for rulings, among other things, (a) that the department could not grant various aspects of the relief sought by the railroads (requests numbered 1 and 4) in the absence of substantial evidence that there were "above the rail losses"[1] involved in maintaining the particular train, service, stops, or station sought to be discontinued, and (b) that it could not, in the absence of such substantial evidence, take into account factors such as (i) the inconvenience of passengers boarding and leaving trains at points more remote from Boston than the several Newton stations (requests numbered 3 and 7), and (ii) the existence of alternative means of mass transportation (request numbered 6). A further request (numbered 5) asked a ruling that the railroads could not prove above the rail losses of trains they proposed to discontinue by comparison

---

[1] "Above the rail expenses" are "the expenses incurred in the actual operations of the train" which would be avoided if the service were to be discontinued. "[B]elow the rail expenses" include "overhead, taxes, signalling costs, superintendent, and so forth." "Above the rail loss" is obtained by deducting appropriate revenues from "above the rail expenses."

of operating expenses of such trains with revenues "from only selected stations."

The applicable statutes, already cited, do not specify the standard to be applied by the department in granting or refusing its consent to a modification of railroad service. The duty of service imposed upon a railroad, however, exists by reason of the "interests of public convenience." See *Department of Pub. Util.* v. *Eastern Mass. St. Ry.* 327 Mass. 450, 454. Accordingly, the department should apply the standard of public convenience and necessity when giving or refusing consent to changes in the requirements imposed by that duty. See *Commonwealth* v. *Fitchburg R.R.* 12 Gray, 180, 187–190 (broad range of factors considered); *Selectmen of Amesbury* v. *Citizens Elec. St. Ry.* 199 Mass. 394, 400–401; *City Council of Salem* v. *Eastern Mass. St. Ry.* 254 Mass. 42, 45 (department "not governed solely by the necessity and convenience of the . . . neighborhood . . . but may . . . consider the necessity and convenience of the general public"); *Boston, Worcester & N. Y. St. Ry.* v. *Commonwealth*, 301 Mass. 283, 284–285 (discontinuance of location "determined broadly from the standpoint of the public interest in the service"). These Massachusetts decisions are supported by the great weight of authority elsewhere: *Illinois Cent. R.R.* v. *Illinois Commerce Commn.* 410 Ill. 77, 82–83, 85–86 ("consideration must be given to the fact that railroads no longer have a monopoly" in view of bus lines, private automobiles, etc.); *Thompson* v. *Illinois Commerce Commn.* 1 Ill. 2d 350, 353, 357–358; *In re application of Chicago, B. & Q. R.R.* 152 Neb. 352, 359–364, also 367, 372–373 (older precedents no longer applicable in view of the "transportation revolution wrought by" motor vehicle); *Boston & Maine R.R.* v. *State*, 97 N. H. 380, 385 ("public good . . . [is to] be determined from the broad standpoint of transportation requirements as a whole"); *Pennsylvania-Reading Seashore Lines* v. *Board of Pub. Util. Commrs.* 5 N. J. 114, 124–131 (but see *In re New Jersey & N. Y. R.R.* 12 N. J. 281, 289–291); *In re Central R.R. of N. J.* 41 N. J. Super. 495, 501–504; *Pennsylvania R.R.* v. *Board of Pub.*

*Util. Commrs.* 48 N. J. Super. 216, 224–230 (proper "to take . . . notice of the situation of all railroads as . . . to passenger service and its draining effect").[1] See also Barnes, Economics of Pub. Util. Regulation, 755–756; annotation, 10 A. L. R. 2d 1121. Cf. the somewhat analogous standard applied in abandonment and extension proceedings under the interstate commerce act as amended; 49 U. S. C. (1952) §§ 1 (18)–1 (22); *Colorado* v. *United States,* 271 U. S. 153, 167–169; Sharfman, Interstate Commerce Commission, vol. III–A, 327–338, 343; Cherington, Regulation of Railroad Abandonments, 119–158. Cf. also *Texas* v. *United States,* 292 U. S. 522, 530–532, and cases cited; *Schaffer Transp. Co.* v. *United States,* 355 U. S. 83, 92–93; *American Trucking Assns. Inc.* v. *United States,* 355 U. S. 141, 152–154.

We hold that, where constitutional issues are not presented, the department is entitled to consider any relevant aspects of the transportation of passengers and freight within the Commonwealth in deciding how the public convenience best will be served, when particular proposals for changes come before it. The department could weigh all the factors mentioned in its decision. It was not obliged to find (where no constitutional issue was raised) in any particular manner or by any single formula the precise amount of avoidable cost or loss involved in continuing the existing service, stops, and stations, or any component part of the service proposed for discontinuance. It properly could give attention to general transportation conditions on these and

---

[1] Other State court cases include *Safford Chamber of Commerce* v. *Corporation Commn. of Ariz.* 81 Ariz. 226, 228; *Chicago & North Western Ry.* v. *Public Serv. Commn.* 329 Mich. 432, 443–452; *State* v. *Public Serv. Commn.* 312 S. W. 2d 791, 803–805 (Mo.); *Commuters' Comm.* v. *Pennsylvania Pub. Util. Commn.* 170 Pa. Super. 596, 604–607; *Fleming* v. *Commonwealth,* 191 Va. 288, 294–296; *Princeton* v. *Public Serv. Commn.* 268 Wis. 542, 552–554. Federal court cases are *Atlantic Coast Line R.R.* v. *Public Serv. Commn. of S. C.* 77 F. Supp. 675, 684–687 (E. D. S. C.); *Chicago, B. & Q. R.R.* v. *Illinois Commerce Commn.* 82 F. Supp. 368 (N. D. Ill); *Ann Arbor R.R.* v. *Michigan Pub. Serv. Commn.* 91 F. Supp. 668, 671–672 (E. D. Mich.); *Atlantic Coast Line R.R.* v. *Florida R.R. & Pub. Util. Commn.* 96 F. Supp. 583, 587 (N. D. Fla.), judgment vacated 342 U.S. 844. These Federal cases were decided before *Alabama Pub. Serv. Commn.* v. *Southern Ry.* 341 U. S. 341, and no longer are authority on the issue of the power of a Federal court to enjoin State action. See *Atlantic Coast Line R.R.* v. *St. Petersburg,* 242 F. 2d 613, 615–616 (5th Cir.). They are properly to be given consideration, however, on the issue of public convenience.

other Massachusetts railroads (see Annual Survey of Mass. Law, 1955, § 15.14, n. 6; 1956, § 15.10; 1957, § 26.5; 1958, § 16.6). The petitioners' requests for rulings could not have been given for they defined much too narrowly the authority of the department.

There was no error in giving the rulings requested by the railroads, which asked the department to reach conclusions, already outlined, justified by subsidiary findings and by substantial evidence. The granting of the railroads' request numbered 12,[1] we interpret as ruling that the department in determining public convenience is to act without giving controlling weight to "purely local considerations," which, of course, must be considered. See *Board of Survey of Arlington* v. *Bay State St. Ry.* 224 Mass. 463, 470. What the department meant by this ruling is sufficiently indicated by its correct statement that the "convenience resulting from the operation of any particular trains or the stopping at particular stations must be evaluated within the context of the entire passenger service. . . ."

Examination of the transcript of testimony and the exhibits [2] shows that the department's subsidiary findings were justified by substantial evidence "such . . . as a reasonable mind might accept as adequate to support a conclusion." See G. L. c. 30A, §§ 1 (6), 14 (8) (e); *Maniscalco* v. *Director of the Div. of Employment Security*, 327 Mass. 211, 214; *Malden* v. *Metropolitan Transit Authy.* 328 Mass. 491, 495; 1954 Annual Survey of Mass. Law, §§ 14–14.22; note 67 Harv. L. Rev. 845, 860. The department could reasonably conclude, from the evidence and the aggregate of all the findings and considerations mentioned in its opinion, that the comprehensive revision of service proposed was

[1] "12. The public convenience and necessity involved . . . is the broad and unbiased view for the promotion of the common good of all the conflicting interests involved and is not to be influenced by purely local considerations. . . ."

[2] The department received 560 typewritten pages of testimony and twenty-three exhibits. Well qualified experts, subject to cross-examination by these petitioners, discussed and carefully analyzed the passenger service with respect to which changes and discontinuances were sought, the proposed future service, available alternative services, and pertinent financial data about the railroads' operations as a whole.

a method of saving annually not less than $77,665 (and possibly much more) consistent with the public convenience and interest and with preserving more essential passenger transportation.

4. The demurrers are to be sustained. A final decree is to be entered dismissing the petition.

*So ordered.*