Town of Wilmington *vs.* Department of Public Utilities
& others.[1]

Suffolk.    December 7, 1960. — January 5, 1961.

Present: Wilkins, C.J., Spalding, Williams, Cutter, & Kirk, JJ.

*Railroad,* Service. *Public Utilities.*

An elimination of all passenger service on a section in Massachusetts of
an interstate main railroad line, where the tracks were to be retained
and some freight trains operated on that section, would not constitute
an abandonment within 49 U. S. C. (1958) § 1 (18) requiring approval
of the Interstate Commerce Commission.   [601–603]

A discontinuance of a railroad station with the expectation that the pas-
sengers formerly using it would use an existing station and a new
station to be built on another line of the railroad would not constitute
a relocation of the discontinued station requiring approval of selectmen
under G. L. c. 160, § 129.   [603]

The regulatory powers of the Department of Public Utilities over a rail-
road include authority to approve discontinuance of passenger service
on a main line of the railroad.   [603–604]

A railroad's elimination of all passenger service over a section of one
of its main lines with the approval of the Department of Public Utili-
ties would not involve a forfeiture of its franchise for freight service.
[604]

No reversible error appeared in a failure by the Department of Public
Utilities, in a proceeding involving railroad passenger service, to give a
request for ruling stating correctly an abstract rule of law not directly
applicable to the issues before the department.   [604–605]

The record of a proceeding before the Department of Public Utilities did
not disclose that the department was unwarranted in making a decision
approving elimination of all passenger service on a section of a main
line of a railroad and discontinuance of stations on that section, re-
routing of passenger trains between Boston and points beyond that
section over another line, elimination of all passenger service on a por-
tion of a "loop" line, and certain passenger service adjustments in
connection with such changes.   [605–607]

Petition, filed in the Supreme Judicial Court for the
county of Suffolk on June 4, 1959.

---

[1] Only the Boston and Maine Railroad appeared before the full court in addi-
tion to the department.   The Attorney General and counsel for the railroad
jointly filed a brief in support of the department's decision.

The case was reserved and reported without decision by *Counihan, J.*

*Philip B. Buzzell,* Town Counsel, for the petitioner.

*Joseph Auerbach, (Robert G. Bleakney, Jr. & James J. Kelleher,* Assistant Attorney General, with him,) for the respondents.

CUTTER, J. This is an appeal by the town under G. L. c. 25, § 5, as amended through St. 1956, c. 190, from a decision of the Department of Public Utilities. That decision approved with minor modifications the Boston and Maine Railroad's discontinuance of certain intrastate passenger service. The decision also approved certain other service adjustments. Demurrers of the railroad and the department were overruled. See *Wilmington* v. *Department of Pub. Util.* 340 Mass. 432, 439. The case was later reserved by a single justice, without decision on the merits, upon the petition, answers, and stipulated portions of the record before the department.

The department's decision authorized the railroad (a) to operate passenger service from Boston over the former Boston-Reading-Lawrence-Haverhill route only as far as Reading; (b) to operate passenger trains from Boston to Lawrence and Haverhill via Wilmington on the "New Hampshire route," so called, thence running from Wilmington to Wilmington Junction over the so called "wildcat" line, and thence north to Lawrence and Haverhill; and (c) to eliminate the stations at Reading Highlands and North Wilmington (which are between Reading and Wilmington Junction). It directed the railroad to construct a station on the wildcat line at Salem Street. The railroad estimated that net annual savings of $255,022 would result from these adjustments. Certain other service adjustments also were authorized or ordered in connection with the operating changes just mentioned. These other adjustments included elimination of all passenger service over the so called Woburn loop between Woburn station and the loop's junction with the New Hampshire route in Wilmington.

The town contends that the department erroneously

refused certain requests of the town for rulings of law. There was no error in the department's action.

1. Requests numbered 1 to 6, inclusive, sought rulings that on all the evidence elimination of all passenger service

and all or virtually all freight service over two sections of an interstate main line would constitute an abandonment within the meaning of § 1 (18) of the Interstate Commerce Act, as amended, 49 U. S. C. (1958) § 1 (18), and would

require approval of the Interstate Commerce Commission. Complete abandonment of these lines would clearly require "the approval of the [I]nterstate [C]ommerce [C]ommission . . . and the abandonment of stations and train service" would require the department's approval. See *Boston & Albany R.R.* v. *Commonwealth,* 296 Mass. 426, 428, 433; *Colorado* v. *United States,* 271 U. S. 153, 164, 167.

The Interstate Commerce Commission has defined the term "abandonment," as used in § 1 (18), as requiring "cessation of service . . . or long disuse of the line, coupled with the intention not to resume such service or use." See *Akron & Barberton Belt R.R. Abandonment of Operation,* 239 I. C. C. 250, 254. See also *Wheeling & Lake Erie Ry.* v. *Pittsburgh & West Virginia Ry.* 33 F. 2d 390, 392 (6th Cir.); *Flint* v. *Grand Trunk Western R.R.* 69 F. 2d 604, 606 (6th Cir.). By the enactment of § 13a of the Interstate Commerce Act, see the Transportation Act of 1958, Pub. L. 625, 85th Congress, 2d Sess., 49 U. S. C. (1958) § 13a, the Interstate Commerce Commission has been given certain new powers over the discontinuance of intrastate service. See *Newton* v. *Department of Pub. Util.* 339 Mass. 535, 541, fn. 2 (hereinafter called the *Newton* case); *New Jersey* v. *United States,* 168 F. Supp. 324, 332–336 (three judge ct. D. N. J.), affd. 359 U. S. 27; *Minneapolis, St. P. & St. S. M. R.R. Discontinuance of Service,* 307 I. C. C. 125. Except, however, as provided in § 13a, the commission does not control intrastate service discontinuances, short of complete and permanent discontinuance of both freight and passenger service, and cannot deal with them as abandonments. See *Palmer* v. *Massachusetts,* 308 U. S. 79, 84–85; *Chicago, N. S. & M. Ry. Abandonment,* 290 I. C. C. 765, 766, 779–780; *Chicago, M., St. P. & P. R.R. Abandonment,* 295 I. C. C. 157, 166; *Kansas City So. Ry.* 94 I. C. C. 691, 692. Cf. *Boston & Maine R.R. Abandonments,* 249 I. C. C. 402, 539, 601 (true abandonments under § 1 [18]); *New York Central R.R. Abandonment,* 254 I. C. C. 745, 763, but see p. 765.

The evidence indicates that there is to be no abandonment

within the meaning of § 1 (18). No removal of tracks is proposed on any of the lines here discussed. No curtailment of freight service to any customer of the railroad is sought. Freight trains will be operated, at least on an intermittent basis, over all parts of the affected lines which are to be maintained. In the light of this evidence, the department was not bound to give the requested rulings 1 to 6, inclusive.

2. Rulings 8, 9, and 10 were each based upon the theory that a "relocation" of the North Wilmington station could not be authorized without the approval of the Wilmington board of selectmen, in view of G. L. c. 160, § 129.[2] The railroad sought not relocation of the North Wilmington station but its discontinuance. Certain of the passengers formerly served at North Wilmington were expected to use the existing Wilmington station. Others might use the new station at Salem Street. This new stop, however, was not sought by the railroad but was ordered by the department. We think that there was no relocation of a station within the meaning of § 129 and that there was no occasion to seek the consent of the Wilmington selectmen. See the *Newton* case, 339 Mass. 535, 541, fn. 1.

3. Requests 11 and 12 sought rulings, in effect, that the department lacked authority to permit the discontinuance of service over a section of one of the railroad's main lines. The department's authority to regulate rail carriers was discussed in the *Newton* case, *supra,* at pp. 541–542, with ample citation of the relevant statutory provisions. See 1956 Annual Survey of Mass. Law, § 15.11. We find nothing which restricts the broad regulatory powers of the department so that it may not approve discontinuance of main line rail passenger service (as distinguished from service on branch lines). The strong implications from the language of c. 159, § 16A, added by St. 1938, c. 243, are that no

---

[2] Section 129 reads, "A railroad . . . may relocate passenger stations . . . with the written approval of the department and of . . . the selectmen of the town where such stations . . . are situated."

such limitation exists. Requests 11 and 12 were properly denied.

4. Request 13 that complete abandonment of all passenger service over one of the railroad's main lines would require a forfeiture of the railroad's franchise for freight service was also properly denied. The precise content and character of the railroad's franchise with respect to the affected lines have not been established on this record. To the extent that the franchise is statutory, that franchise has inevitably been much affected by the comprehensive statutory powers to regulate railroads for the protection of the public given by the Legislature to the department, and by the Congress to the Interstate Commerce Commission. These powers include authority in the appropriate regulatory body, subject to constitutional limitations, to ensure the provision of reasonable and adequate railroad facilities and service and to dispense with facilities and service no longer needed in the public interest. Upon this record there was no occasion for the department, nor is there reason for us, to consider any matter of forfeiture of the railroad's franchise. We do not consider whether the town in any event would have standing in this or any other proceeding to seek forfeiture of the railroad's franchise.

5. There was no error in the failure of the department to give the town's request numbered 7, in effect that it is a carrier's duty to provide "reasonably adequate facilities for serving the public," a duty which "cannot be avoided merely because it will be attended by some pecuniary loss." The language of the request was taken from *Chesapeake & Ohio Ry.* v. *Public Serv. Commn. of the State of W. Va.* 242 U. S. 603, 607, and from a concurring opinion in *Alabama Pub. Serv. Commn.* v. *Southern Ry.* 341 U. S. 341, 353. Those cases involved the constitutional issue of confiscation, not directly presented here, where the department was exercising its statutory regulatory powers and giving appropriate consideration, as it was bound to do, to all aspects of the public convenience and necessity. The department could appropriately have given the requested

ruling as stating correctly an abstract rule of law not directly applicable to the issues. Its failure to do so in the circumstances does not constitute reversible error.

6. Requests 14 and 15 seek rulings that "[o]n all the evidence this [d]epartment would not be warranted . . . in granting authority for complete abandonment of all passenger service over" the portions of the lines where passenger service discontinuance in fact has been authorized by the department. The department's subsidiary findings are to be sustained if justified by substantial evidence. See G. L. c. 30A, §§ 1 (6), 14 (8) (e), and the *Newton* case, 339 Mass. 535, 548–549. The department found that "only forty people a day use the thirty-four trains that operate presently from Reading to points north"; that "[t]he North Wilmington station is used by approximately ninety to one hundred persons daily and is 2.5 miles from [the] Wilmington station"; that service can be provided for these patrons by the construction of a station on the wildcat line at Salem Street; that "[r]ush hour service to Wilmington . . . will remain substantially the same"; that for a train discontinued at Wilmington a faster train will be substituted; that the remaining service curtailed is lightly patronized; that "Wilmington will have fifteen trains inbound and sixteen outbound weekdays"; that the changes will eliminate various passenger train crossings at grade; and that the railroad's computations of estimated savings from the changes in service have been done by "a reasonable . . . [method] for the purpose for which it was used in the present case."

On the railroad's financial condition, the department found that "the overall financial results . . . for 1958 showed a deterioration from the level of the preceding year" with a "passenger deficit, although reduced[,] still . . . at approximately $9.6 million." The railroad had a "net income" of $764,161.58 in 1957 and a net deficit in 1958 of $3,242,207.29. Freight revenues were down $7 million in 1958 from 1957. Estimates, taking into account the contemplated economies, were that at best net income would

result in a rate of return of less than three per cent, even in the event of (a) a reduction of the passenger deficit to $8.7 million, and (b) a $5.5 million increase in freight revenues over 1958 levels.

The town argues that the railroad was not shown to be in such financial difficulties as would justify the department's decision, and points (a) to improvement in the railroad's balance sheet position over the period between the end of 1945 and the end of 1958, and (b) to the hope of improved operating results over those of the 1958 recession period. It attributed a dangerous decline in the railroad's cash position in large part to major capital expenditures for new facilities and equipment. These equipment expenditures, however, were made largely to handle passenger traffic more economically and to reduce passenger deficits. Under G. L. c. 25, § 5, the burden is on the appealing party to show that the department's decision was invalid. The town has failed to sustain this burden. The department was justified, in the light of the considerations mentioned in its decision, in regarding the financial problems of the railroad as sufficiently serious to require drastic operating economies. The department could properly view the railroad's unsatisfactory current operations as much more significant than the slight long term improvement in the book value of the equity of common stockholders who have not received any return on their investment in many years. It could properly give very great weight to the railroad's necessity of establishing improved earnings sufficient to enable it to obtain new loans and extension of the maturities of existing indebtedness.

The town also contends that an alternate plan of adjusting service advanced by it would have enabled the railroad to realize as large or nearly as large savings with less inconvenience to the public. The discussion in the town's brief indicates that the alternate plan would involve loss to the railroad of certain crossing protection savings, although there might be substantial offsets to this loss. It was a matter for the department's decision whether to approve the proposal of the railroad or that of the town. There was

substantial evidence supporting the department's choice.[3]

It is apparent that the department made a careful analysis of the railroad's proposals. It received 266 exhibits from the railroad alone. It heard testimony which covers 2,153 pages of stenographic transcript. Those portions of the evidence, referred to by the parties as constituting a basis for their respective positions, provide ample and substantial ground for the department's findings. In view of the evidence supporting those findings, the department was not required to grant requested rulings 14 and 15. The considerations of the public interest, which the department was entitled to take into account in reaching its conclusions, have been adequately discussed in the *Newton* case at pp. 545–548.

7. A final decree is to be entered affirming the decision and order of the department.

*So ordered.*

---

[3] The department concluded, "Doubtless particular individuals may suffer some inconvenience as a result of the changes permitted herein, but the duty of this [c]ommission to the public requires that a broader view be taken . . . to achieve the greatest good for the greatest number of people over the longest period of time. . . . [A] crisis has been reached in the railroad passenger transportation business. . . . Freight business, which in the past has been the source of sufficient revenue to support substantial passenger deficits, has become increasingly competitive. . . . [T]he Boston and Maine Railroad and New England present aggravated instances of these trends. The high proportion of passenger traffic carried by the [r]ailroad and the resulting substantial losses threaten its very existence. Not only the bulk of the passenger service, but freight business and the general business of the community are affected by the inability of the [r]ailroad to meet its obligations and to maintain its freight business. . . . It is doubtful that without the changes which we have allowed herein the [r]ailroad can continue to function. If passenger service is to survive, those portions of it which generate costs far out of proportion to the number of people served must be eliminated."