HOLYOKE STREET RAILWAY COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES & another.

Suffolk.  April 9, 1964. — May 4, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & REARDON, JJ.

*Public Utilities.   Carrier,* Bus.   *Contract,* Between bus companies.   *State Administrative Procedure Act.*

A contract between a common carrier of passengers by motor bus applying for a certificate of public convenience and necessity from the Department of Public Utilities to operate in a certain territory and another such carrier already operating therein, providing that the prior carrier would not object to the application if the certificate should "be subject to the agreements" in the contract and that if the certificate were granted the applicant would pay to the prior carrier stated amounts per passenger carried by the applicant, in its inception was not void as against public policy on the ground that it dealt with matters subject to determination by the department under G. L. c. 159A, § 7; but the department, after issuing a certificate to the applicant conditioned on the payment provision of the contract and reserving a "right to review, modify or cancel" the contract "at any time in whole or in any respect . . . in the public interest," had power under § 7 to strike the payment provision from the certificate if, upon substantial evidence, it found that to require the payments was no longer in the public interest [444–445]
In a contract between a common carrier of passengers by motor bus applying for a certificate of public convenience and necessity from the Department of Public Utilities to operate in a certain territory and another such carrier already operating therein, providing for payments by the applicant to the prior carrier of stated amounts per passenger

carried by the applicant and contemplating conditioning of the applicant's certificate upon the payment provision, a further provision that the contract should "remain in full force" despite any subsequent amendment of the certificate would be ineffective as against a proper amendment thereof by the department pursuant to its regulatory powers under G. L. c. 159A, § 7, striking from the certificate such a condition originally contained therein.   [446]

In a proceeding for review of an order of the Department of Public Utilities, made on petition by a common carrier of passengers furnishing through bus service between large cities, amending the carrier's certificate of public convenience and necessity by striking therefrom a condition, originally inserted therein for the protection of a local common carrier of passengers by bus and in accordance with a contract between the two carriers, requiring certain payments by the through carrier to the local carrier per passenger carried by the through carrier in the local carrier's territory, where it appeared that the order rested largely on findings by the department of losses incurred by the through carrier and absence of diversion of traffic by it from the local carrier but that such findings were not supported by substantial evidence before the department as required by G. L. c. 30A, § 14 (8), the order was annulled and the case was remanded to the department for further consideration by it.   [450–451]

PETITION filed in the Supreme Judicial Court for the county of Suffolk on November 23, 1960.

The case was reserved and reported by *Cutter*, J., without decision.

*Eliot P. Brooks* (*John S. Begley* with him) for the Holyoke Street Railway Company.

*Frank Daniels* for the intervener, Peter Pan Bus Lines, Inc.

*Samuel Adams*, Assistant Attorney General, for the Department of Public Utilities.

CUTTER, J.   This is an appeal by Holyoke Street Railway Company (Holyoke Company) from an order of the Department of Public Utilities (D.P.U. 12,620) dated October 25, 1960, granting a petition (dated June 12, 1958) of Peter Pan Bus Lines, Inc. (Peter Pan) for amendment of a certificate (No. 3089, see D.P.U. 11,137) of public convenience and necessity permitting Peter Pan's predecessor, one Picknelly (doing business as Peter Pan Bus Lines), to operate between Springfield and Northampton over routes in these two communities and in West Springfield, Chicopee, Hol-

yoke, and Easthampton.   At the request of the parties, a single justice reported the case without decision for determination by the full court.

Picknelly in 1933 began interstate bus operation, under authority granted by the Interstate Commerce Commission, serving points between Northampton and Boston, via Springfield and Stafford Springs, Connecticut.   Picknelly also had an intrastate route between Springfield and Boston.   Prior to 1955 he could not carry passengers between Springfield and Northampton nor could he carry passengers between Northampton and Boston without going through Stafford Springs.   In 1954 (D.P.U. 11,137) Picknelly sought leave to operate (1) through service between Northampton and Springfield and (2) without going through Connecticut, service between Northampton and points east of Springfield, including Boston.   Prior to 1955, through service had been provided between Northampton and Springfield by a joint operation of Holyoke Company and either another street railway or another bus company.   This involved a transfer at the Northampton-Easthampton boundary.

In 1952, the department had denied four bus companies permission to give service between Northampton and Holyoke.   This was done in order to protect Holyoke Company, as a local carrier, against "competition which might impair . . . [its] operating revenue."   The department then also dismissed a petition by Picknelly to give such service because he did not have the necessary local licenses.   See G. L. c. 159A, § 1, as amended through St. 1956, c. 99.   See also G. L. (Ter. Ed.) c. 159A, § 3.

In late 1954 Holyoke Company and Picknelly came to an agreement under which the former withdrew its opposition to granting Picknelly a local license in Holyoke.   Such a local license was issued and Picknelly then filed his application (D.P.U. 11,137), mentioned above, for leave to carry passengers between Springfield and Northampton via Holyoke.

While the 1954 application (D.P.U. 11,137) was pending, Holyoke Company and Picknelly entered into a written con-

tract, dated December 2, 1954, (1) that Holyoke Company would not object to the granting of the application if the certificate should "be subject to the agreements" in the contract, and (2) that if Picknelly should be granted a certificate he (and his successors) would pay to Holyoke Company stated amounts (either fifteen cents or twenty cents depending upon the place of pick up or discharge) per passenger carried by his line to or from certain territories served by Holyoke Company. The contract also provided that if the department "should issue a certificate . . . to . . . Picknelly, and . . . if such certificate . . . should be amended by the [d]epartment . . . [thereafter], then . . . [the contract] shall remain in full force."

The department, by its order of January 21, 1955, in D.P.U. 11,137, issued to Picknelly a certificate, subject to certain restrictions not now relevant and to a condition relating to the contract of December 2, 1954.[1] The record reveals no appeal by Holyoke Company from this decision (D.P.U. 11,137). Picknelly made the payments called for by the contract for about one year.

On June 12, 1958, Peter Pan filed its present petition (D.P.U. 12,620) to be relieved of the proviso (fn. 1) in the certificate. The director of the department's division of railway and bus utilities presided as hearing officer at a public hearing (held September 10, 1958) on this petition and on October 5, 1960, recommended that it be dismissed. On October 25, 1960, the department disregarded this recommendation (cf. *Norwood Ice Co.* v. *Milk Control Commn.* 338 Mass. 435, 441), struck the proviso from the certificate, and ordered that the contract of December 2, 1954, "be . . . canceled."

---

[1] This condition read, "Further provided, [t]hat the [d]epartment hereby makes as a condition of this certificate, a written agreement dated December 2, 1954 between . . . Picknelly . . . and . . . Holyoke . . . Company . . . insofar as it treats with the payment of certain sums of money to . . . Holyoke Company by . . . Picknelly as recompense for losses of revenue which would result, through the intrastate operation of buses by said Picknelly over said route, in the diversion of traffic from said Holyoke Company in the territory now served by . . . [it], *reserving, however, to the [d]epartment the right to review, modify or cancel said agreement at any time in whole or in any respect as it may find such action to be in the public interest"* (emphasis supplied).

Holyoke Company now contends (1) that the contract of December 2, 1954, remains valid and cannot be controlled by the department without taking Holyoke Company's property without due process of law; (2) that the Legislature has not given the department authority over that contract; and (3) that, in any event, certain aspects of the department's decision (D.P.U. 12,620) were incorrect.

1. The department has been given "general supervision and regulation of, and jurisdiction and control over, the following services, when . . . rendered for public use within the commonwealth, and all persons . . . [and] corporations . . . rendering . . . such . . . services," as common carriers, including the "carriage of passengers for hire upon motor vehicles as provided in" G. L. c. 159A. See G. L. c. 159, § 12 (as amended through St. 1945, c. 175). See also *Newton* v. *Department of Pub. Util.* 339 Mass. 535, 541. General Laws c. 159A, § 7 (as amended through St. 1956, c. 329), provides in part, "No person shall operate a motor vehicle under a license issued . . . [by local authorities for the carriage of passengers for hire as a common carrier] unless he has also obtained from the department a certificate declaring that public convenience and necessity require such operation. The department may . . . issue or refuse to issue such a certificate, or may issue the same for the partial exercise only of the privilege sought. Such certificate shall specify the . . . routes over which the motor vehicles . . . may operate . . . and may attach to the exercise of said rights such terms and conditions as the department shall deem that public convenience and necessity may require. The department, after notice and hearing, may revoke any such certificate *for cause,* and may, *in like manner,* revise any provisions thereof and any of the terms and conditions of such certificate or license. . . ." (emphasis supplied). Section 7 thus gives to the "department . . . continuing power . . . to revise the provisions of a certificate." See *Fortier* v. *Department of Pub. Util.* 342 Mass. 728, 731.

The contract of December 2, 1954, between Picknelly and Holyoke Company dealt with a matter which under § 7 was

subject to the determination of the department, viz. the terms upon which a certificate of public convenience and necessity should be issued. The department in its order of January 21, 1955 (D.P.U. 11,137), took notice of the contract, but did not make its order subject to it, for the department expressly reserved (in a manner consistent with, if not required by, § 7) the right to review, modify or cancel the contract "at any time . . . or in any respect as . . . [the department] may find . . . to be in the public interest." Picknelly and Holyoke Company could not bind the department to adhere to and enforce their contract, and, in any event, the department properly refused so to be bound. The department had power under § 7 to strike from the certificate the proviso concerning the payments to Holyoke Company, if, upon substantial evidence, it found that to require those payments was no longer in the public interest. See the *Fortier* case, 342 Mass. 728, 731–732.

Holyoke Company seems to have recognized the department's continuing power to amend the certificate. The department, however, has done more than that. It has ordered that the contract be canceled despite the provision that the contract was to remain in effect even if the certificate should be amended. This provision plainly was an attempt by Holyoke Company to guard against the possibility of a change of mind on the part of the department.

We think that in its inception the contract was not void as against public policy, even though it dealt with intercompany competition which, in at least many aspects, was subject to regulation by the department. The contract contemplated its submission to the department. Cf. *Montana-Dakota Util. Co.* v. *Williams Elec. Coöp. Inc.* 263 F. 2d 431, 433–436 (8th Cir.) ; Restatement: Contracts, § 564; Corbin, Contracts, § 1452; Williston, Contracts (2d ed.) § 1733; annotation, 70 A. L. R. 2d 1326. There was to be no concealment of its provisions and of Holyoke Company's conditional commitment not to oppose the granting of a certificate to Picknelly. Cf. also *New York City Transit Authy.* v. *Jamaica Buses, Inc.* 16 App. Div. 2d (N. Y.) 959; *New York*

*City Transit Authy.* v. *Green Bus Lines, Inc.* 16 App. Div. 2d (N. Y.) 959. The department not only knew about the contract, but it included most of its terms in D.P.U. 11,137.

The provision that, despite an amendment of the certificate, the contract was to remain in effect stands upon a different basis. It purported to make the contract enforceable notwithstanding any later departmental amendment of the certificate. The contract dealt directly with the terms of the public service operations of two carriers in their relation to each other. It purported to impose a term of their continuing competition. This aspect of these carriers' competition with one another was a matter so directly affecting the public interest as to be subject to the department's regulatory powers. See G. L. c. 159, § 12, and c. 159A, § 7, both as amended. Such a contract between the carriers cannot be permitted to defeat the purpose of any proper subsequent exercise of the department's powers. It cannot be enforced while in conflict with the department's orders. See *New England Tel. & Tel. Co.* v. *Brockton,* 332 Mass. 662, 665–668. See also *Louisville & Nashville R.R.* v. *Mottley,* 219 U. S. 467, 485; *Union Dry Goods Co.* v. *Georgia Pub. Serv. Corp.* 248 U. S. 372, 375–377; *Norfolk So. Bus Corp.* v. *Virginia Dare Transp. Co. Inc.* 159 F. 2d 306, 311 (4th Cir.), cert. den. 331 U. S. 827; *Tulsa* v. *Midland Valley R.R.* 168 F. 2d 252, 254–255 (10th Cir.); *Producers Transp. Inc., Extension-Asphalt Emulsion,* 86 M. C. C. 323, 324–326 (I.C.C.); Corbin, Contracts, § 1515. Cf. *Scott Paper Co.* v. *Marcalus Mfg. Co. Inc.* 326 U. S. 249, 256–257. Compare also cases of unreasonable department interference with the details of a regulated company's performance of its public service functions or with its prerogatives of management. *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 262 Mass. 137, 146–151.

2. The department, in striking out the condition in Peter Pan's certificate, appears to us to have rested its decision (D.P.U. 12,620) very largely on the losses incurred by Peter Pan on the Springfield-Northampton route. The decision stated, "The important consideration . . . is the evidence

of the substantial losses being incurred by . . . [Peter Pan] on . . . [this] route . . . . The volume of traffic which was originally expected to develop on this route has not materialized. We do not find any evidence of any diversion of traffic from the lines of . . . Holyoke . . . Company. Accordingly, the condition . . . does not accomplish the purpose for which it was intended, namely, to preclude . . . [Peter Pan] from profiting at the expense of . . . Holyoke . . . Company by means of diverting patronage from the latter. On the contrary, it now appears that . . . [Peter Pan's] other customers are subsidizing the riders on this route." These findings must stand if they are based on substantial evidence.

The evidence shows that the bulk of Peter Pan's passengers ride between Springfield and Boston and intermediate points. Through passengers picked up between Northampton and Springfield, of course, tend to add to the volume of traffic, and to reduce the cost of operation per mile, between Boston and Springfield. That is "one of the reasons" Peter Pan is "operating between Northampton and Springfield." The Northampton-Springfield service is "a local service in conjunction with a through service."

Various exhibits were introduced indicating that Peter Pan was losing money on its Springfield-Northampton service.[2] That loss by 1958 seemed to be decreasing slightly and

---

[2] Exhibits indicated the following experience of Peter Pan on the Springfield-Northampton service.

|  | Bus miles | Revenue per bus mile | Cost per bus mile | Loss per bus mile |
|---|---|---|---|---|
| (1) 12 months ended Jan. 31, 1956* | 129,480 | $ .091 | $ .329 | $ .238 |
| (2) 11 months ended Dec. 31, 1956** | 120,240 | .137 | .351 | .214 |
| (3) 12 months ended Dec. 31, 1957*** | 129,520 | .184 | .385 | .201 |
| (4) 8 months ended Aug. 31, 1958 | 81,760 | .195 | .388 | .193 |

\* figures after $3,228.02 deduction for payments to Holyoke Company
\*\* figures after $ 245.35 deduction for payments to Holyoke Company
\*\*\* no deduction for payments to Holyoke Company

The president of Peter Pan testified to some of the following results of Peter Pan's overall operations. Others appear in Peter Pan's annual reports which were in evidence.

revenues per bus mile were increasing. The figures in evidence concerning the traffic on the Springfield-Northampton segment indicate no attempt to credit to the segment any part of the net revenues derived by the balance of Peter Pan's system (Boston-Springfield) from passengers originating or terminating their travel on the feeder line segment.

The hearing officer asked Peter Pan for an exhibit which would show the additional passengers picked up as a result of the permission to operate to Northampton. The request was by no means wholly clear but we interpret it as calling for some indication of the additional passengers obtained for Peter Pan on a broader basis than the exhibits summarized in the first part of fn. 2. Counsel for Peter Pan undertook to furnish such an exhibit. No such exhibit is in the record. It is not unusual in determining the losses or earning capacity of a feeder line to take into account the contribution to system net earnings of traffic originating and terminating on the feeder line, and to regard a carrier's operations "not piecemeal by the [particular] certificate but rather comprehensively according to the entire range of . . . [the carrier's] activities viewed as a whole." See *Department of Pub. Util.* v. *Eastern Mass. St. Ry.* 327 Mass. 450, 453. See also *Southern Ry.* v. *North Carolina,* 376 U. S. 93, 103–105; Sharfman, Interstate Commerce Commission, vol. III–A, pp. 327–346; Cherington, Regulation of Railroad Abandonments, 159, 163–166; annotation, 10 A. L. R. 2d 1121, 1130–1149. Cf. G. L. c. 159, § 16A (inserted by St. 1938, c. 243). Peter Pan's system net earnings have been increasing in recent years (fn. 2).

| | Regular Route Passengers | Operating Revenue | Net Income or loss (before income taxes) | | Net worth | |
|------|------|------|------|------|------|------|
| 1954 | 177,851 | $300,245 | LOSS | $ 7,893 | $96,317 | (a) |
| 1955 | 188,342 | 318,803 | INCOME | 6,825 | 98,078 | (a) |
| 1956 | 199,739 | 338,666 | INCOME | 2,807 | 71,724 | (b) |
| 1957 | 267,255 | 458,411 | INCOME | 31,348 | 91,001 | (b) |

(a) partnership operation      (b) corporate operation

In 1957 Peter Pan had a net income after all taxes of $19,551, and in 1959 the comparable figure was $50,198. Peter Pan incurred no overall loss after 1954.

There is little evidence bearing upon whether Peter Pan diverted from Holyoke Company any substantial amount of traffic after Picknelly received the Northampton-Springfield certificate. The payment by Picknelly in the twelve months ended January 31, 1956, of $3,228.02 to Holyoke Company indicates that in those twelve months Picknelly in fact carried a significant number of passengers picked up or discharged in the portions of Holyoke Company's territory specified in the agreement of December 2, 1954. Whether these passengers were diverted from Holyoke Company cannot be ascertained with precision. It is reasonable, however, to infer that many of these would have used Holyoke Company's service if the Peter Pan service had not been available. In any event Picknelly and Holyoke Company had agreed in their contract that these passengers should "be considered a diversion of traffic from Holyoke Company for the purpose of reimbursement." Even if it be assumed that these passengers were all at the twenty cent reimbursement rate, $3,228 would represent 16,140 passengers in twelve months (cf. Picknelly's total regular route passengers, fn. 2), a substantial diversion (if all were diverted) from Holyoke Company, a bus carrier engaged in local public mass transportation service in a city of moderate size. Other evidence of the extent of Peter Pan's diversion of traffic from Holyoke Company does not appear. That type of evidence was peculiarly within Peter Pan's control for it had, or could have had, the records of the fares it collected and of where it picked up and discharged its passengers.

It thus appears that the department, in disregarding the recommendation of its hearing officer and in revising Peter Pan's certificate, made one of its principal findings upon incomplete evidence because of Peter Pan's failure to furnish material which it had promised to furnish. We cannot say that the department's conclusion would not have been affected by that evidence, or that its absence was not prejudicial to Holyoke Company. Such meager evidence as underlay the department's other principal finding suggested a different conclusion, so that the second finding is not sup-

ported by substantial evidence. Peter Pan had the best opportunity to make such evidence available if it existed.

The department had power to revise Peter Pan's certificate without regard to the contract of December 2, 1954. In doing so it could exercise a wide range of discretion in appraising the public interest and in adopting reasonable policies, principles, and standards for its guidance. It could apply such principles where the action was justified by substantial evidence, and could determine what weight should be given to the various relevant considerations. See *Newton* v. *Department of Pub. Util.* 339 Mass. 535, 546–548. The department's decision does not expressly state any change in its policy (referred to by the hearing officer in his recommendations) "to protect . . . existing local carriers [like Holyoke Company] against competition which would injuriously affect their revenues and possibly result in increased fares and inferior service to the public within the municipalities which they serve." That policy apparently led to the department's insertion (see D.P.U. 11,137) of the proviso in Peter Pan's certificate. As we have already indicated, it was within the department's regulatory power to adopt that policy after weighing all aspects of the public interest. We assume (cf. *Schaffer Transp. Co.* v. *United States,* 355 U. S. 83, 91) that, after like consideration of the public interest, the department was free to change that policy. If it had decided to adopt new principles for its guidance and had based that action upon findings of fact supported by substantial evidence, a very different situation would have been presented to us.

We view the department's new decision (D.P.U. 12,260) as purporting to apply the same principles and policy which led to inserting the proviso in the certificate and as resting upon the principal findings already quoted. Because those findings do not meet the standards laid down in G. L. c. 30A, § 14 (8), we return the case to the department for further consideration, and, if necessary, for the taking of further evidence. It may be that, upon clarification of the decision, it will appear that the department intended to apply prin-

ciples somewhat different from those which led to its earlier action (D.P.U. 11,137) and that it relied upon evidence not clearly referred to in its decision. Upon the decision and record before us, no such intention or reliance has been made manifest.

3. A final decree is to be entered annulling the order (D.P.U. 12,620) of the department. The case is recommitted to the department for further proceedings consistent with this opinion.

*So·ordered.*