STATE BOARD OF RETIREMENT *vs.* CONTRIBUTORY RETIREMENT
APPEAL BOARD & another.[1]

Suffolk.   December 8, 1960. — February 10, 1961.

Present: WILKINS, C.J., SPALDING, WILLIAMS, CUTTER, & KIRK, JJ.

*Retirement. Administrative Board. Equity Pleading and Practice,* Parties, *Appeal. State Administrative Procedure Act. Proximate Cause. Evidence,* Opinion: expert. *Words,* "Person . . . aggrieved."

One member of a public board which is a party to a suit has no standing
    to appeal from a decree therein separately and individually.   [59]
The State board of retirement, a participant through its counsel before
    the contributory retirement appeal board on an appeal from a decision
    of the State board, had standing as a "person . . . aggrieved" to obtain
    a court review under § 14 of the State administrative procedure act,
    G. L. c. 30A, of a decision by the appeal board reversing that of the
    State board.   [59–60]
Certain medical and other evidence before the contributory retirement ap-
    peal board, respecting an Attorney General who had suffered from heart
    trouble for years but still led a vigorous life and who, a few weeks
    after he had engaged in political activity and had worked over a period
    at his office, his home, and out of the State on a railroad case, suffered a
    cerebral embolism in his office and thereafter was largely incapacitated
    until his sudden death from a cerebral embolism about six weeks later,
    did not amount to "substantial evidence" sufficient to support a con-
    clusion that his death was a proximate result of a work connected per-
    sonal injury within G. L. c. 32, § 9 (1), and a decision by the appeal
    board awarding his widow benefits under that section was properly
    reversed by the Superior Court on review under the State administra-
    tive procedure act.   [65–66]
Medical evidence was necessary to establish a causal connection between
    the work of an Attorney General and his death from a cerebral em-
    bolism.   [65]
A vague and general answer by a medical witness to a hypothetical ques-
    tion based on assumptions of material facts not shown by the evidence
    had no probative value.   [65–66]

PETITION for review filed in the Superior Court on De-
cember 8, 1959.

The case was heard by *Gourdin, J.*

[1] Mrs. Fingold.

*Matthew S. Heaphy,* for the respondent Ethelyn E. Fingold.

*Daniel A. Lynch,* (*David L. Whitney* & *Paul F. Degnan* with him,) for the State Board of Retirement.

CUTTER, J.   On December 30, 1958, Ethelyn E. Fingold applied under G. L. c. 32, § 9 (1), to the State board of retirement (the State board) for an accidental death benefit as the widow of Mr. George Fingold.   At his sudden death on August 31, 1958, shown by the death certificate to have been caused by "cerebral embolism—rheumatic valvular heart disease," he was Attorney General of the Commonwealth.   She alleged that Mr. Fingold's death resulted from accidental injuries sustained on July 16, 1958, while in the performance of and within the scope of his duties. The State board unanimously denied the application.   Mrs. Fingold appealed to the contributory retirement appeal board (the appeal board).   After hearing, a majority of the appeal board, one member dissenting, reversed the State board's decision and ordered it to grant benefits.   The State board then sought in the Superior Court a review (see G. L. c. 30A, § 14) of the appeal board's decision.   Mrs. Fingold's demurrer was overruled.   The case was heard on the merits by a judge of the Superior Court upon the record before the appeal board.   A decree was entered reversing the decision of the appeal board.   Mrs. Fingold has appealed from the decree overruling the demurrer and from the final decree.   One member of the appeal board has also purported to appeal.

1.   The individual member of the appeal board has no standing to appeal.   As one member of a public board, he cannot act separately and individually in this manner. *Carr* v. *Board of Appeals of Medford,* 334 Mass. 77, 79–81.

2.   One ground of Mrs. Fingold's demurrer is that the State board cannot be a "person . . . aggrieved" within G. L. c. 30A, § 14, and that, accordingly, the Superior Court had no jurisdiction.   Section 14 provides that "any person . . . aggrieved by a final decision of any agency in an adjudicatory proceeding . . . shall be entitled to a judicial review."   "Person," see c. 30A, § 1, "includes all political

subdivisions of the commonwealth.'' Cf. *Robinson Clay Prod. Co.* v. *Beacon Constr. Co. of Mass. Inc.* 339 Mass. 406, 407–408. By G. L. c. 10, § 18 (as amended through St. 1945, c. 658, § 2), the State board was created to administer the State employees' retirement system established under G. L. c. 32, especially § 20 (1) (b) and (5). Section 20 also provides for teachers' retirement, county, and city and town systems.

There have been similar reviews at the instance of local retirement boards. See e.g. *Quincy Retirement Bd.* v. *Contributory Retirement Appeal Bd.* 340 Mass. 56; *Boston Retirement Bd.* v. *Contributory Retirement Appeal Bd.* 340 Mass. 109; *Boston Retirement Bd.* v. *Contributory Retirement Appeal Bd.* 340 Mass. 112. See also *Natick* v. *Massachusetts Dept. of Pub. Welfare,* 341 Mass. 618. The State board has an obligation to protect the integrity of the State system and the interests with respect to that system of the public and of the State's taxpayers. See G. L. c. 32, § 22 (7) (a), as amended through St. 1945, c. 658, § 1. This obligation is of the same character as that of the local boards with reference to their respective systems. The rights of review granted by c. 30A are not to be interpreted narrowly where only the petitioner for review seems likely to attempt to protect aspects of the public interest. See *Wilmington* v. *Department of Pub. Util.* 340 Mass. 432, 437–439; *S. C.* 341 Mass. 599. The State board's counsel appeared before the appeal board and participated actively without objection. The State board was properly there treated as present either as of right or by acquiescence in an informal intervention. See G. L. c. 30A, § 1 (3) (c).

The demurrer was properly overruled. Nothing in *Percival's Case,* 268 Mass. 50, in *Marshall* v. *Registrar of Motor Vehicles,* 324 Mass. 468, or in *Iannelle* v. *Fire Commr. of Boston,* 331 Mass. 250, all relied upon by Mrs. Fingold, requires a different conclusion.

3. The decision of the appeal board must stand unless, see G. L. c. 30A, § 14 (8) (e), it is ''[u]nsupported by substantial evidence.'' See G. L. c. 30A, § 1 (6). Accordingly, we must determine whether there was substantial evidence

upon which the appeal board could reasonably conclude (a) that Mr. Fingold "died . . . as a result of cerebral embolism . . . precipitated by the duties of his office"; (b) that his death "was . . . the natural and proximate result of a personal injury sustained . . . as a result of, and while in the performance of, his duties . . . as envisioned by G. L. c. 32, § 9 (1)"; and (c) that "his spouse is entitled to . . . benefits." Relevant portions of c. 32, § 9 (1), inserted by St. 1945, c. 658, § 1, are set out in the margin.[1] Relevant evidence before the appeal board is summarized below.

(1) The medical examiner answered "No" to the question in his certificate whether the "disease or injury [was] in any way related to [the] occupation of [the] deceased." The board had before it the death certificate, already mentioned. See G. L. c. 46, § 19 (as amended through St. 1950, c. 366).

(2) In May, 1958, Mr. Fingold began work with two assistants on what was referred to in the evidence as "the Old Colony case." See *Opinion of the Justices,* 337 Mass. 800. Mrs. Fingold testified that when this work began his "health seemed in normal, good condition." Mr. Fingold did something on the case almost daily, made several trips to New Haven for hearings, and worked on it at home as well as in his office. Upon his final return from New Haven on June 25, 1958, "[h]e was extremely tired, and . . . went directly to bed." At times during the period of the hearings, he showed signs of weariness and perhaps of shortness of breath.

This record contains the 497 page transcript of the Federal court hearings in New Haven, held on May 23 and 27, and on June 23, 24, and 25, 1958. Mr. Fingold appeared on

---

[1] Section 9 (1) reads in part: "If the board . . . finds that any member [of the system] in service died *as the natural and proximate result of a personal injury* sustained or a *hazard undergone as a result of,* and *while in the performance of,* his *duties at some definite place and at some definite time* . . . without serious and wilful misconduct on his part, the payments . . . hereinafter referred to . . . shall be granted to his beneficiary . . ." (emphasis supplied). The meaning of this section in relation to heart disease was discussed in *Baruffaldi* v. *Contributory Retirement Appeal Bd.* 337 Mass. 495, 499–502.

May 23 and argued some preliminary matters. His partici-
pation in these hearings in open court consisted (a) on
May 23, of some objections to evidence and possibly partici-
pation in a conference in the judge's office, (b) on May 27,
of three brief colloquies, and (c) on June 23, of a brief
statement at the opening of the hearing and cross-examina-
tion (thirty-nine pages of the transcript) of the president
of the New York, New Haven and Hartford Railroad. Mr.
Fingold also participated in a conference of railroad of-
ficials, officers of the Commonwealth, and members of the
Legislature, held in the judge's chambers on June 25. To
this conference Mr. Fingold had been recalled by telephone
on June 24, after he had returned that day to his home in
Concord, Massachusetts. After June 25 Mr. Fingold con-
ferred with officials and others in an effort to put into effect
the arrangements negotiated at the conference with the
judge.

(3) Prior to the Republican pre-primary convention on
June 14, Mr. Fingold "traveled throughout the Common-
wealth talking to . . . groups of delegates" and "con-
ferred with a great many people." At the convention he
made a speech accepting his nomination for the office of
Governor. Thereafter he had numerous meetings with
small groups in Boston and elsewhere about his campaign.
Mrs. Fingold testified, however, that Mr. Fingold "used
. . . [politics] almost like a hobby" and that political ac-
tivity "never had taken any extra exertion out of him."

(4) Mr. Fingold had been treated for "a heart condition
from 1948." He had suffered from rheumatic heart dis-
ease. His gall bladder had been removed. In May, 1958,
he had been treated at home for a virus infection, and he
had been given shots "for the Asiatic flu." There was con-
flicting evidence about the extent to which he had otherwise
been treated by a doctor in 1957 and 1958. Dr. Duston, a
general practitioner, had treated him "all these years" for
auricular fibrillation, "a complication of his heart disease."
Other doctors called in consultation in 1958 did not testify.

(5) He was a hard worker and a vigorous campaigner,
in his office substantially every day, usually by nine, and

arrived "home . . . never until after seven . . . on evenings that he did come home." He smoked cigars "excessively" and his "eating habits were irregular." Anything "he did he did vigorously." There were times when he came home tired—and then he went to bed early. His doctor advised Mr. Fingold in June, 1958, "not to go to the office because he was in circulatory failure." Against the doctor's "advice . . . [Mr. Fingold] went to New Haven." The doctor then "noticed he had sort of an attitude of defeatism."

(6) On July 16, Mr. Fingold "had an attack in . . . [his] office" in midafternoon. He had arrived about 8:30 A.M. looking "pale, drawn," and had been holding conferences with assistants and other officials during the day. His doctor found him "prostrate on a couch," with "signs of having had a cerebral injury." At the hospital, he was treated by Dr. Neptune and Dr. Bradley, and examined by Dr. Lang of the Lahey Clinic. None of these doctors testified before the appeal board. He was discharged from the hospital on July 30, "unable to speak clearly" and "to use his left eye." He had difficulty walking. The doctors advised him "to have complete rest at home." For much of the period between July 30 and his death, he would make one trip downstairs each day. He saw at home a few people from his office, received his mail, and visited his doctor. After July 16, Mr. Fingold did not return to his office.

(7) On August 30, Mr. Fingold returned from a boating party in Marblehead in the early afternoon. At 6:30 P.M. he went to a dinner and spoke for about twelve minutes to "a large gathering" in a "hot and sticky" room. About 9:30 P.M. he went "directly home." The next morning, while sitting in his garden about 11:30 A.M., he tried to get out of his chair, could not do so, and died suddenly.

(8) Dr. Duston was asked a hypothetical question which assumed (a) "rheumatic heart disease . . . for more than seven years"; (b) that Mr. Fingold "was under a great strain . . . as Attorney General especially on the Old Colony case"; (c) that "traveling back and forth to New

Haven'' and ''appearing in New Haven . . . weakened and exhausted him''; (d) that he was hospitalized from July 16 to 30 after a ''cerebral embolism'' with a ''diagnosis of rheumatic and valvular heart disease, mitral insufficiency, atrial fibrillation''; and (e) that he died suddenly on August 31 ''from cerebral embolism.'' On these assumptions, Dr. Duston testified that Mr. ''Fingold was more likely to suffer a cerebral accident when he was in a state of circulatory failure, than at any other time''; that ''cerebral accidents are more likely to occur when the blood pressure is low''; and that he (the doctor) believed that ''the strain of his work aggravating his heart failure precipitated this cerebral accident.'' On cross-examination Dr. Duston admitted (a) that a man can have an embolism or a clot affixed to some part of the wall of the heart without any symptoms whatsoever and that the cause could not be told by anybody; (b) that he never saw Mr. Fingold's complete hospital record; and (c) that he did not know what Mr. Fingold's activities were on July 14, 15, and 16, and that, having that in mind, any opinion he gave was ''of necessity based at least in part on speculation and conjecture.''

(9) Dr. Norman Welch, making essentially all the same assumptions already described in connection with Dr. Duston's testimony, testified that in his opinion there was ''a relationship between the work which Mr. Fingold did and his death.'' Dr. Welch further stated that the ''evidence suggests to me that this man was not in good physical condition after . . . the New Haven . . . case . . . and . . . that this condition of poor health continued up until the time he was admitted to the hospital.'' He quite plainly rested his opinion in part at least on these matters which the evidence ''suggest[ed]'' to him. He also stated that ''with a background of rheumatic heart disease and atrial fibrillation, stress and strain could be an important factor,'' a factor ''greater than a possibility.'' Dr. Welch admitted that he had not treated or examined Mr. Fingold when alive, that he never conferred at any time with any of the doctors who took care of Mr. Fingold at the hospital, and that he did not know what Mr. Fingold had done on any day

from July 1 to July 16. He based his opinion in part on the assumptions "that Mr. Fingold's health was not the same after the New Haven" case, "that as a result of the New Haven case, Mr. Fingold was weak and exhausted," and that the "condition of weakness and exhaustion continued up until July 16."

The testimony summarized above does not amount to "substantial evidence" that the embolism from which Mr. Fingold died was "a personal injury sustained . . . as a result of, and while in the performance of, his duties at some definite place and . . . time," within G. L. c. 32, § 9 (1). The evidence that Mr. Fingold was "tired" on June 25 and thereafter is too vague to furnish basis for finding that his condition was significantly different on June 25, 1958, after the Old Colony hearing, from what it was when he began work on that case in May. His work on the case was in no way unusual for a trial lawyer. Two of Mr. Fingold's assistants took the principal burden in these hearings. The conferences in chambers have not been shown to have involved special strain. The trial judge correctly concluded that the Old Colony case involved only "routine court procedure."

This is a case in which medical testimony, entitled to probative value, is required in order to establish a causal connection between work and death. *Jacquot* v. *Wm. Filene's Sons Co.* 337 Mass. 312, 318. See *LeBlanc's Case,* 334 Mass. 265, 267. Cf. *Lovely's Case,* 336 Mass. 512, 515–516. We agree with the trial judge that the somewhat vague and general answers to the hypothetical questions put to the doctors are without probative value, even if it be assumed[1] that medical science knows the relationship be-

---

[1] Dr. Howard B. Sprague, a well qualified cardiologist associated with the Harvard Medical School and the Massachusetts General Hospital, testified in effect that it is totally unknown to medical science what causes a thrombos to form in the heart or an embolism to ensue. He had "never [before] heard stress and strain suggested as a cause of formation of clots in the . . . heart." In his opinion, the theory advanced in behalf of Mrs. Fingold had "no justification whatsoever," and Mr. Fingold's work was "totally unrelated" to the attack on July 16, 1958, and to his death. We need not determine, however, whether this theory must be disregarded because unknown to medical science and "contrary to common knowledge or common sense." See *Sevigny's Case,* 337 Mass. 747, 751–753.

tween work and the development of a thrombos or an embolism. The questions to Dr. Duston and Dr. Welch were each based upon assumptions not established in evidence. The answers are entitled to no weight. See *Brown* v. *United States Fid. & Guar. Co.* 336 Mass. 609, 613–614. There is no adequate basis in the evidence for any assumption that Mr. Fingold ''was under great strain in association with his work . . . especially on the Old Colony case'' or that his somewhat limited ''appearances in court in New Haven . . . weakened and exhausted him'' or that any such ''weakness and exhaustion continued until July 16.'' There was little evidence of what Mr. Fingold did between June 25, when the court hearings in New Haven ended, and July 16. He was shown in June, 1958, to have been engaged in political and pre-primary convention activity, and to have received the convention's nomination for Governor. The record left to conjecture whether and to what extent his general heart condition after 1948, his office activity, his political activities, the natural deterioration in his physical condition as he grew older, and his tendency to lead a vigorous life were severally responsible for whatever weariness he showed in June and July. Testimony of Mr. Fingold's secretary that after the trips in June to New Haven Mr. Fingold ''was becoming tired all the time, . . . was always worried about getting back to the office,'' and described himself as ''really bushed,'' did not establish the cause of that weariness, or that work on the Old Colony case caused any significant change in Mr. Fingold's physical condition during May and June, 1958.

4. The interlocutory decree overruling the demurrer and the final decree reversing the decision of the appeal board are affirmed.

*So ordered.*