GWYNNE MCCARTHY *vs.* CHARLES W. HAUCK.

Middlesex.    February 10, 1983. — April 5, 1983.

Present: GRANT, CUTTER, & KASS, JJ.

*Negligence,* Anesthesiologist.  *Evidence,* Expert opinion, Admitted without objection.

At the trial of a negligence action against an anesthesiologist to recover for injuries claimed to have been sustained as a result of improper insertion of a nasal tube during an operation, the evidence was sufficient to permit the jury to infer that prior to surgery the plaintiff did not have sinus problems and her nose was straight and regular. [606-607]

At the trial of a negligence action against an anesthesiologist to recover for injuries to the plaintiff's nose claimed to have been sustained as a result of improper insertion of a nasal tube during an operation, the judge did not abuse his discretion in permitting the plaintiff's expert to give his opinion concerning the size of the plaintiff's nasal passages before surgery based on his observation of a preoperative photograph of the plaintiff. [607-608]

At the trial of a negligence action against an anesthesiologist to recover for injuries to the plaintiff's nose claimed to have been sustained as a result of improper insertion of an endotracheal tube during an operation, evidence was insufficient to warrant a finding for the plaintiff where the plaintiff's case depended on an assumption by an expert witness that the endotracheal tube used during the operation was of the same type as a clear plastic semi-rigid tube introduced in evidence without objection, where deposition testimony of the defendant that he had used "a soft red rubber tube" was read to the jury, and where there was no evidence that the tube used during the operation was made of semi-rigid clear plastic. [608-610]

CIVIL ACTION commenced in the Superior Court on December 31, 1975.

The case was tried before *Mitchell,* J.

*Kenneth L. Carson* for the defendant.

*Joseph I. Mulligan, Jr.,* for the plaintiff.

KASS, J.  Roughly stated, the plaintiff complains that the defendant, an anesthesiologist, put her to sleep so that she might have two impacted wisdom teeth pulled and two root canals filled by an oral surgeon and that, by reason of his negligence, she woke up with a broken nose.[1]  A jury returned a verdict of $30,000 and the defendant appeals from orders of a Superior Court judge denying the motions for judgment notwithstanding the verdict and for a new trial.

To test whether judgment n.o.v. was in order it is necessary to consider whether there is competent evidence in the record from which the jury could find a combination of circumstances permitting, in turn, the drawing of reasonable inferences sufficient to warrant finding for the plaintiff. *Poirier* v. *Plymouth,* 374 Mass. 206, 212 (1978).  *Abraham* v. *Woburn,* 383 Mass. 724, 727-728 (1981).  *O'Shaughnessy* v. *Besse,* 7 Mass. App. Ct. 727, 728-729 (1979).  *Henderson* v. *D'Annolfo, ante* 413, 419 (1983).  Smith & Zobel, Rules Practice § 50.6, at 203 (1977).  Accordingly, we plunge into the evidence most favorable to the plaintiff.

McCarthy, the plaintiff, submitted to oral surgery as an in-patient at Sancta Maria Hospital in Cambridge on October 2, 1973.  Two doctors were in attendance:  Dr. Sleeper, the oral surgeon and Dr. Hauck, the anesthesiologist.  A nurse under Dr. Hauck's supervision administered general anesthesia through a No. 7 nasal cuffed endotracheal tube inserted into the patient's nose and leading to the trachea.

Following surgery the plaintiff "couldn't breath through the left side of my nose and I was having nosebleeds and a lot of pain."  She developed a sinus infection which caused headaches and discharge down her throat containing pus.  When the swelling went down the plaintiff's nose "was way off to the right side of my face."

Dr. Sleeper assured the plaintiff that these were natural postoperative discomforts which would go away in time.

---

[1] While the plaintiff was on the operating table, the oral surgeon also extracted two additional molars and filled two teeth.

When she pressed Dr. Sleeper about the miserable state of her nose, inside and out, he said that whatever was wrong with the nose had been caused by the anesthesiologist. A bump also appeared on the plaintiff's nose which had not been there before the oral surgery. In the eyes of the plaintiff's mother, "[H]er face had changed, her nose had changed shape . . . it changed the length of her nose in such a way that it just wasn't her nose."

Something more than a year after surgery, the plaintiff consulted Dr. Klotz, an ear, nose, and throat specialist. He diagnosed a septum deviated markedly to the left side and recommended a submucous resection, an operation he performed in March, 1975. This improved the patient's nasal breathing, but the infection and drainage problem persisted. Dr. Klotz performed a second operation to improve the draining of the afflicted sinus cavity.

Later, in March, 1976, another plastic surgeon, Dr. Elia, performed still another operation to straighten the plaintiff's nose. His postoperative notes describe his observation of "an obvious nasal fracture" and that "the site of the old fracture and subsequent deviation of the nose could be palpated . . . ."[2]

There was evidence from an expert witness called by the plaintiff, Dr. Wysocki, that a deviated septum is usually traumatic in origin and that a nose fracture and a deviated septum are "concomitant injuries usually." Dr. Wysocki also gave it as his opinion, assuming the plaintiff's nose to be straight and regular before oral surgery, that intubation through a nasal passage with the No. 7 endotracheal tube was a most likely cause of her broken nose and deviated sep-

---

[2] Dr. Elia's notes also reported that the injury to his patient's nose had occurred as a consequence of a fall. That was evidence decidedly not favorable to the plaintiff. The credibility of her explanation, that Dr. Elia and she had cooked up the fall so as to make the required plastic surgery eligible for third-party payment, was for the jury to determine.

tum.[3]  Other assumptions were put to Dr. Wysocki which we shall discuss below.

For the elements of negligence and causation necessary to her case the plaintiff relied on the expert testimony of Dr. Wysocki.  See *Haggerty* v. *McCarthy,* 344 Mass. 136, 139 (1962); *McCarthy* v. *Boston City Hosp.,* 358 Mass. 639, 643-644 (1971).  The defendant attacks that testimony by seeking to knock from under it the factual assumptions upon which it rested.  Those assumptions must have been established in the evidence.  *State Bd. of Retirement* v. *Contributory Retirement Appeal Bd.,* 342 Mass. 58, 66 (1961). *Wing* v. *Commonwealth,* 359 Mass. 286, 288 (1971).  *Roddy* v. *Fleischman Distilling Sales Corp.,* 360 Mass. 623, 627 (1971).  Liacos, Massachusetts Evidence 116 (5th ed. 1981). On the question whether the anesthesia procedure was the cause of her deviated septum, Dr. Wysocki was asked to assume that:  (a) prior to surgery the plaintiff did not have sinus problems and her nose was straight and regular; (b) soon after surgery she developed sinusitis; (c) before surgery her septum was not deviated; (d) after surgery it was; and (e) intubation was with a No. 7 cuffed endotracheal tube made of clear semi-rigid plastic.

1. *The before and after surgery condition of the plaintiff.*

Evidence touching on the plaintiff's preoperative condition was thin.  However, a comprehensive medical history taken ten months earlier in connection with gynecological surgery included no reference to sinus disorders (head, eyes, ears, nose, and throat appear to have been subjects of inquiry); the plaintiff's testimony described her nose and sinus problems as a postsurgery phenomenon; and the plaintiff's mother corroborated this, at least as to the misshapen nose. We cannot say that was insufficient to permit a jury rationally to infer that the plaintiff's sinusitis and misshapen nose

---

[3] To one of the hypothetical questions put to him, Dr. Wysocki made a metaphorical response:  "Based upon the propositions and the premises I'd have to say yes, there's hoofprints around here that's probably made by horses not zebras."  The judge requested, and received, a more prosaic response.

followed her oral surgery. Our deference to what the jury chose to believe and stitch together from the evidence is considerable. *New England Acceptance Corp.* v. *American Manufacturers Mut. Ins. Co.*, 373 Mass. 594, 596 (1977). See *Abraham* v. *Woburn*, 383 Mass. 724, 729-730 (1981). No witness had made an observation about a deviated septum until November, 1974, when Dr. Klotz examined the plaintiff, but there was evidence of the plaintiff's nasal distress following oral surgery and of the possibility that a deviated septum would bring on sinusitis.

2. *The size of the plaintiff's nasal passages.*

In another hypothetical question put to Dr. Wysocki it became necessary for him to make some estimates about the size of the plaintiff's nasal passages before the oral surgery. The manner in which Dr. Wysocki did this, the defendant urges, exposes an Achilles' heel in the plaintiff's case. Plaintiff's counsel had asked Dr. Wysocki to assume that her nasal passage between the septum and the turbinates was less than the diameter of the endotracheal tube "as you have before you there." The judge sustained an objection because there was no evidence of the diameter of that portion of her nose before surgery. To overcome that hurdle plaintiff's counsel showed the expert a preoperative picture of the plaintiff, in party dress and at three-quarter profile. Did that photograph, the question was put, give "any information as to the size of her nose?" Dr. Wysocki ventured that it did and that her nasal passage then must have been within two or three millimeters (4/100 to 8/100 of an inch) of what it was when he examined her after three intervening operations.

We have examined the photograph and the defendant's protest that this testimony was incredible is not wholly without basis, but credibility was for the jury. The deeper point argued by the defendant is that an opinion from an expert will be disregarded if it amounts to no more than speculation "from subordinate facts that do not give adequate support to the conclusion reached." *Sevigny's Case,* 337 Mass. 747, 751 (1958). Dr. Wysocki is a general and

plastic surgeon. Skeptical as we are of his deductions from the photograph, we decline to say that someone with his specialized knowledge could not make them, nor are we prepared, on these facts, to invade the trial judge's discretion in such matters. See *M. DeMatteo Constr. Co.* v. *Daggett*, 341 Mass. 252, 261 (1960); *MacKay* v. *Ratner*, 353 Mass. 563, 566-568 (1968); *Commonwealth* v. *Burke*, 376 Mass. 539, 541 (1978). Contrast *State Bd. of Retirement* v. *Contributory Retirement Appeal Bd.*, 342 Mass. at 66; *Kennedy* v. *U-Haul Co.*, 360 Mass. 71, 73-74 (1971); *Swartz* v. *General Motors Corp.*, 375 Mass. 628, 632-633 (1978). The gaps in the hypothetical question, notably the failure to consider that three operations on the plaintiff's nose had been performed after the oral surgery, affected the weight to be accorded Dr. Wysocki's answer but not its admissibility. *M. DeMatteo Constr. Co.* v. *Daggett, supra* at 261. It was open to defense counsel to point out and to probe the implications of those omissions on cross-examination. *LeBlanc* v. *Ford Motor Co.*, 346 Mass. 225, 232. *Commonwealth* v. *Burke, supra* at 541. He did so vigorously.

3. *Assumptions about the kind of endotracheal tube used.*

When he gave his opinion that the endotracheal tube was the instrument of damage, Dr. Wysocki was asked to assume use of a tube which was shown to him at trial and which he was able to examine. The plaintiff had earlier introduced that tube as an exhibit, without objection. It was a clear plastic and semi-rigid tube marked "I.D. 7.0 nasal-oral tube/cuffed/true murphy tip and eye."

There was no dispute at trial that the plaintiff had been intubated with a No. 7 cuffed endotracheal tube. No testimony, however, had established that the clear plastic semi-rigid tube was representative of the seven millimeter (the dimension is that of the tube's interior diameter) tube used under the defendant's supervision when the plaintiff underwent oral surgery. Indeed, the only evidence in the case about the nature of the tube described something quite different and, for purposes of the case, significantly different.

Dr. Hauck, the defendant, never was called as a witness but the plaintiff read to the jury a transcript of his deposition. Describing the anesthesiological procedures employed in the plaintiff's case, Dr. Hauck spoke of "using nasal cuffed endotracheal tube number 7. That is the only one we have, a soft red rubber tube which couldn't do any damage."

If nothing else, the defendant's deposition testimony established that "No. 7 cuffed endotracheal tube" was not a self-defining term. While it was not required that the jury believe Dr. Hauck's testimony that the endotracheal tube was red, soft and made of rubber, neither the witness Dr. Wysocki nor the jury could use disbelief to leap over the evidentiary crevasse to the assumption that it was colorless, semi-rigid and made of plastic. *Fraser* v. *Fraser*, 336 Mass. 597, 600-601 (1958). *Kunkel* v. *Alger*, 10 Mass. App. Ct. 76, 86 (1980). Liacos, Massachusetts Evidence 435 (5th ed. 1981).

No subsequent evidence furnished the missing link. No doctor or nurse appeared to testify which of the tubes was ordinarily used for the procedure performed on the plaintiff, whether both might be, or what was the usual practice, if there was one, at the hospital where the oral surgery was performed. The plaintiff's argument that Dr. Wysocki could assume use of the clear semi-rigid tube because it had been admitted as an exhibit without objection does not close the gap. To be sure, evidence admitted in the absence of objection retains probative force, *Freyermuth* v. *Lutfy*, 376 Mass. 612, 616-617 (1978), but the exhibit in this case proves only that a No. 7 endotracheal tube may be made of semi-rigid clear plastic.[4] That such a tube was used in the plaintiff's case remains in the area of speculation. See *Sevigny's Case*, 337 Mass. at 751-752; *State Bd. of Retirement* v. *Con-*

---

[4] Dr. Sleeper, the witness through whom the clear plastic tube was admitted, disavowed any memory of what kind of tracheal tube was used to anesthetize the plaintiff. All he could say about the tube shown him by the plaintiff's lawyer was that it was a No. 7 endotracheal tube because, "It says so."

*tributary Retirement Appeal Bd.,* 342 Mass. at 65-66; *Sweeney's Case,* 3 Mass. App. Ct. 284, 286 (1975); *Girard* v. *Crawford,* 13 Mass. App. Ct. 916 (1982). Cf. *Barrette* v. *Hight,* 353 Mass. 268, 275-276 (1967). Contrast *Poirier* v. *Plymouth,* 374 Mass. at 212-215. In view of the reliance of the plaintiff's sole expert on an assumption about the nature of the endotracheal tube not supported by evidence, the jury lacked a basis for making a finding in favor of the plaintiff. *Alholm* v. *Wareham,* 371 Mass. 621, 627-628 (1976). The motion for judgment notwithstanding the verdict should have been allowed.

Having so decided, we need not consider the other claims of error which the defendant has advanced.

*Judgment reversed.*

*Judgment for the defendant.*