MASSACHUSETTS TEACHERS' RETIREMENT SYSTEM *vs.*
CONTRIBUTORY RETIREMENT APPEAL BOARD & another.[1]

Suffolk. May 6, 2013. - August 28, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Contributory Retirement Appeal Board. Retirement. Public Employment,*
Retirement. *School and School Committee,* Retirement benefits. *Interest.*
*Administrative Law,* Regulations, Agency's interpretation of regulation,
Agency's interpretation of statute. *Regulation. Statute,* Construction.

Discussion of the statutory framework whereby a member of a public retire-
ment system may purchase credit for work or other service performed
before becoming a member of the retirement system, and of the history of
the statute and regulation permitting vocational education teachers to
purchase such credit. [294-296]

The Contributory Retirement Appeal Board (board) erred in failing to give
deference to a regulation promulgated by the Massachusetts Teachers'
Retirement System (retirement system) relating to the date on which "buy-
back" interest begins to accrue when a vocational education teacher who is
a member of the retirement system purchases creditable service for work
performed before he or she became a member, where in the applicable
statute, G. L. c. 32, § 4 (1) (*h*¹/₂), the Legislature was silent on the issue of
the date on which such interest begins to accrue, and where the retirement
system's policy determination, as reflected in the regulation, that buyback
interest should approximate as closely as possible the return on investment
that the retirement system could have earned had the member actually
contributed to the retirement system during the years of creditable service
being purchased was consistent with other statutes concerning creditable
service purchases for teachers. [296-302]

CIVIL ACTION commenced in the Superior Court Department on
August 20, 2010.

The case was heard by *Janet L. Sanders*, J., on a motion for
judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*James C. O'Leary* (*James H. Salvie*, Special Assistant Attor-
ney General, with him) for the plaintiff.

---

[1] James T. Walsh.

*Kirk G. Hanson*, Assistant Attorney General, for Contributory Retirement Appeal Board.

*Timothy J. Smyth*, for Boston Retirement Board, amicus curiae, submitted a brief.

DUFFLY, J. We are called upon to settle a dispute between two administrative agencies, the Massachusetts Teachers' Retirement System (MTRS) and the Contributory Retirement Appeal Board (CRAB), concerning the validity of a regulation promulgated by MTRS.[2]

James T. Walsh had been a professional electrician for many years when, in 1980, he was certified by the Department of Education to teach in his occupational field. In October, 1987, he began full-time employment at a vocational school and became a member of MTRS. In December, 2005, before the effective date of his retirement the following June, Walsh applied to MTRS to increase his anticipated retirement allowance by adding to his "creditable service" (his years of service as a member of MTRS) through the "buyback" of three years of creditable service, based on his work experience as an electrician. Walsh sought credit for service performed from February 1, 1977, through January 31, 1980. This buyback required Walsh to pay certain "makeup payments" into the annuity savings fund of MTRS, in accordance with a formula set forth in G. L. c. 32, § 4 (1) ($h^{1}/_{2}$) (trade service credit statute). That statutory formula calls for "buyback interest" to be paid on such makeup payments. Pursuant to 807 Code Mass. Regs. § 14.05 (2005),[3] a regulation promulgated by MTRS, MTRS assessed buyback interest to commence as of February 1, 1977, the beginning of the three-year period for which Walsh sought trade service credit.[4]

Walsh appealed the action of MTRS to CRAB. See G. L. c. 32, § 16 (4). He claimed that buyback interest should not

---

[2]We acknowledge the amicus brief of the Boston Retirement Board in support of the Massachusetts Teachers' Retirement System.

[3]The regulation provides: " 'Buyback interest' will be charged back to the years of service being purchased." 807 Code Mass. Regs. § 14.05 (2005).

[4]Walsh claimed that, by having interest accrue beginning on February 1, 1977, he was required to pay an additional $7,000 to $8,000 in buyback interest. The total cost to Walsh of the trade service credit — that is, the makeup payments plus interest as calculated by MTRS — was $26,770.74.

have begun to accrue until October, 1987, when he became a member of the MTRS. After a hearing before the division of administrative law appeals (DALA), an administrative magistrate affirmed the action of MTRS. Walsh appealed that decision to CRAB, which reversed DALA's decision.

MTRS sought review of CRAB's decision in the Superior Court pursuant to G. L. c. 30A, § 14. Deferring to CRAB's interpretation of the trade service credit statute, a Superior Court judge allowed CRAB's motion for judgment on the pleadings. MTRS appealed, and we transferred the case to this court on our own motion. We conclude that G. L. c. 32, § 4 (1) (*h*½), is silent on the issue of when buyback interest accrues, and that 807 Code Mass. Regs. § 14.05 is a reasonable interpretation of statutory silence. The regulation promulgated by MTRS is therefore a valid exercise of MTRS's statutory authority, and CRAB's failure to assess interest in accordance with 807 Code Mass. Regs. § 14.05 was an error of law. Thus, CRAB's decision must be reversed.

*Statutory and regulatory framework.* Pursuant to G. L. c. 32, a public employee in the Commonwealth earns a retirement allowance as a member of a public retirement system, such as MTRS. See *Rosing* v. *Teachers' Retirement Sys.*, 458 Mass. 283, 285 (2010). A member's retirement allowance is based, in part, on the number of years and full months of "creditable service" earned by the member at the time of retirement. G. L. c. 32, § 5 (2) (*a*). See *Pelonzi* v. *Retirement Bd. of Beverly*, 451 Mass. 475, 477 & n.3 (2008). Creditable service ordinarily is based on the duration of a member's employment in public service in the Commonwealth while a member of a public retirement system.[5] See G. L. c. 32, § 4 (1) (*a*). During that time, the member contributes a certain percentage of her salary to the retirement system by means of a payroll deduction. G. L. c. 32, § 22 (1) (*b*). See *Cooper* v. *Commissioner of Revenue*, 421 Mass. 557, 558 (1995), cert. denied, 517 U.S. 1221 (1996), citing G. L. c. 32, § 22. In certain situations, a member of a retirement system may purchase additional creditable service, or credit, for work or other service performed before becoming a member of a retirement system.

[5]General Laws c. 32 refers to such service as "membership service." G. L. c. 32, § 1.

See *Rotondi* v. *Contributory Retirement Appeal Bd.*, 463 Mass. 644, 646 n.4 (2012). The purchase of credit can substantially increase the member's annual retirement allowance.[6]

In September, 2005, the Legislature passed an enactment permitting vocational education teachers to purchase up to three years of credit for certain prior work experience in the trade in which the member became a teacher. See St. 2005, c. 90, codified at G. L. c. 32, § 4 (1) ($h^{1}/2$) ("An Act relative to creditable service for vocational education teachers"). Under that provision, a member in service of the MTRS for at least ten years may purchase up to three years of "creditable service for any period or periods of prior work experience in the occupational field in which the member became a vocational-technical teacher and which was required as a condition of the member's employment and licensure under regulations of the department of education." G. L. c. 32, § 4 (1) ($h^{1}/2$). To receive the additional trade service credit, the member must pay into the retirement system's annuity savings fund certain "makeup payments," defined as an amount which is equal to ten per cent of the member's regular annual compensation as of the member's most recent date of entry into MTRS membership, plus "buyback interest" on that amount.[7] See G. L. c. 32, § 4 (1) ($h^{1}/2$).[8]

Soon after the enactment of G. L. c. 32, § 4 (1) ($h^{1}/2$), at a meeting in November, 2005, the MTRS board (board), the

---

[6]By purchasing an additional three years of credit, Walsh's retirement allowance increased by $4,752.81 annually.

[7]The term "buyback interest" is defined in G. L. c. 32, § 1, as "one-half of actuarial assumed interest," which is "a rate equal to a system's actuarial assumed rate of return on investments, as determined from time to time by the [public employee retirement administration] commission" (PERAC). The statute does not define when buyback interest accrues.

[8]General Laws c. 32, § 4 (1) ($h^{1}/2$), provides for the calculation and payment of "makeup payments" as follows:

> "No credit shall be allowed until the member has paid into the Annuity Savings Fund of the system before any retirement allowance becomes effective for the member, in [one] sum, or in installments, upon the terms and conditions that the board prescribes, makeup payments of an amount equal to [ten] per cent of the regular annual compensation of the member as of the member's most recent date of entry into membership in the teachers' retirement system . . . , for each year of service purchased plus buyback interest thereon."

governing body of MTRS, see G. L. c. 15, § 16, discussed what
it perceived to be an ambiguity in the trade service credit statute
as to the date from which buyback interest should be charged.
The board specifically considered whether buyback interest
should begin to accrue on the period of trade service being
purchased, or, instead, on the date the member joined the MTRS;
as reflected in the minutes of that meeting, "the Board voted to
adopt on an emergency basis the version with interest going
back to the date of service."

After soliciting comments on the proposed regulation, hold-
ing a public hearing, and reviewing material prepared by its
staff, the board voted to adopt a regulation, codified at 807
Code Mass. Regs. § 14.05, providing that interest "be charged
back to the years of service being purchased." Thereafter, the
board submitted the regulation for approval to the public em-
ployee retirement administration commission (PERAC), as
required by G. L. c. 32, § 20 (5) (b).[9] PERAC approved the
regulation in February, 2006.

*Discussion.* CRAB claims that the language of G. L. c. 32,
§ 4 (1) ($h^1/_2$), provides unambiguously that the date on which
buyback interest begins to accrue is the date the member joined
the retirement system, which in Walsh's case was October,
1987. CRAB argues that, even if the statute is ambiguous or
silent on the issue, its own interpretation, and not the regulation
promulgated by MTRS, is entitled to deference. CRAB further
contends that, even assuming MTRS's interpretation as set forth
in its regulation is entitled to deference, the regulation is not a
reasonable interpretation of G. L. c. 32, § 4 (1) ($h^1/_2$), and is
therefore invalid.

As a preliminary matter, we address CRAB's claim that,
notwithstanding the promulgation of 807 Code Mass. Regs.
§ 14.05, we should defer to CRAB's contrary interpretation of
G. L. c. 32, § 4 (1) ($h^1/_2$). CRAB does not dispute MTRS's
authority to promulgate certain regulations concerning the
calculation of "makeup payments" under the trade service credit
statute. Where a regulation has been duly promulgated, we do

---

[9]PERAC oversees the work of the retirement systems and has authority to
promulgate rules and regulations as "necessary from time to time to effectuate
the purposes of [G. L. c. 32]." G. L. c. 32, § 21 (4). See G. L. c. 7, § 50.

not give deference to a different administrative agency's contrary conclusion. See 1 R.J. Pierce, Jr., *Administrative Law Treatise* § 3.5, at 197-198 (5th ed. 2010) (where rulemaking and adjudicatory authority are vested in separate Federal agencies, deference under *Chevron U.S.A., Inc.* v. *Natural Resources Defense Council*, 467 U.S. 837 [1984] [*Chevron*], is not extended to agency with only adjudicatory responsibilities). "[A] properly promulgated regulation has the force of law . . . and must be accorded all the deference due to a statute" (citation omitted). *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 723, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette*, 464 U.S. 936 (1983). See *Poe* v. *Sex Offender Registry Bd.*, 456 Mass. 801, 809 (2010), quoting *Massachusetts Fed'n of Teachers* v. *Board of Educ.*, 436 Mass. 763, 771 (2002).

Because it is undisputed that MTRS has the authority to promulgate regulations interpreting G. L. c. 32, § 4 (1) ($h\frac{1}{2}$), subject to PERAC approval, and there is no claim that the regulation was not properly promulgated, our focus is on whether 807 Code Mass. Regs. § 14.05 reflects a reasonable interpretation of the statute. See *Biogen IDEC MA, Inc.* v. *Treasurer & Receiver Gen.*, 454 Mass. 174, 186-187 (2009); *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 632-634 (2005) (*Goldberg*). If the regulation provides a reasonable resolution, an adjudicating agency such as CRAB has an obligation to follow it. Cf. *Boston Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 441 Mass. 78, 82 (2004), citing *Flemings* v. *Contributory Retirement Appeal Bd.*, 431 Mass. 374, 375 (2000) ("Where an agency's interpretation of a statute is reasonable, the court should not supplant it with its own judgment").

We employ a two-part test to assess the validity of an administrative agency's properly promulgated regulation. *Goldberg, supra* at 632. "First, we determine, using conventional tools of statutory interpretation, whether the Legislature has spoken with certainty on the topic in question, and if we conclude that the statute is unambiguous, we give effect to the Legislature's intent." *Id.* at 632-633. "Second, if the Legislature has not addressed directly the pertinent issue, we determine whether the agency's resolution of that issue may 'be reconciled with the governing legislation.' " *Id.* at 633, quoting *Nuclear Metals,*

*Inc.* v. *Low-Level Radioactive Waste Mgt. Bd.,* 421 Mass. 196, 211 (1992). See *Chevron, supra* at 842-843 (describing two-part test used to ascertain validity of Federal agency regulation).

Thus, we consider first "whether the Legislature has spoken with certainty on" the accrual of buyback interest in G. L. c. 32, § 4 (1) ($h^1/_2$). *Goldberg, supra* at 632-633. Our focus at this stage is on the text of the statute because its plain meaning will serve as our primary interpretive guide. See, e.g., *Reading Coop. Bank* v. *Suffolk Constr. Co.,* 464 Mass. 543, 547 (2013).

The cost to a vocational education teacher of the purchase of credit for prior work experience is defined by G. L. c. 32, § 4 (1) ($h^1/_2$), as "makeup payments of an amount equal to [ten] per cent of the regular annual compensation of the member as of the member's most recent date of entry into membership in the teachers' retirement system . . . , for each year of service purchased plus buyback interest thereon." CRAB discerns in this language a clear legislative mandate that the date buyback interest begins to accrue is the member's most recent date of entry into membership in the teachers' retirement system, by undertaking a two-step interpretation of the statute. First, CRAB notes (and we agree) that the word "thereon" in G. L. c. 32, § 4 (1) ($h^1/_2$), means that the buyback interest is charged on "makeup payments." Building on this observation, CRAB contends that, because the amount of a makeup payment is calculated with reference to "the member's most recent date of entry into membership in the teachers' retirement system," the Legislature must have intended also that interest begin to accrue on that same date.

MTRS responds that the word "makeup" implies that buyback interest is designed to compensate MTRS for the return on investment that it could have earned had the member actually contributed to the retirement system during the years of creditable service being purchased. MTRS contends that, consistent with this view, interest should begin to accrue during the period of trade service credit being purchased. We discern no clarity of intent in G. L. c. 32, § 4 (1) ($h^1/_2$), on the question of buyback interest accrual, particularly when the trade service credit provision is read in connection with related statutes. Cf. *Wolfe* v. *Gormally,* 440 Mass. 699, 704 (2004), quoting 2A N.J. Singer,

Sutherland Statutory Construction § 46.05, at 154 (6th ed. rev. 2000) ("statute must be viewed 'as a whole'; it is 'not proper to confine interpretation to the one section to be construed' "). For instance, the provision governing the purchase of credit for volunteer service in the Peace Corps provides that buyback interest must be paid "for the period of volunteer service" purchased, even though, like the trade service credit statute, it uses the member's salary on the date the member joined the MTRS to calculate the makeup payments to which interest applies. G. L. c. 32, § 4 (1) (*r*).[10] This provision suggests that the date of interest accrual is not necessarily tied to the date used to calculate the amount of the member's makeup payment.

Nor does it follow inescapably from the Legislature's use of the term "makeup" that interest must accrue over the period of the trade service being purchased, as MTRS suggests, rather than at the later date suggested by CRAB. Another service credit provision, G. L. c. 32, § 4 (1) (*h*), authorizing veterans of the armed services to purchase creditable service, employs the concept of "makeup payments" without requiring any interest payment.[11]

---

[10]General Laws c. 32, § 4 (1) (*r*), provides in relevant part:

"Eligibility for the creditable service of members in service of a retirement system shall be conditioned upon payment, in [one] sum or in installments upon such terms as the applicable retirement board may provide, into the annuity savings fund of the applicable retirement system, of an amount equal to the contributions such member in service would have otherwise paid into the retirement system plus buyback interest thereon for the period of volunteer service based upon the annual salary the member received in the first year of membership service after that volunteer service."

[11]General Laws c. 32, § 4 (1) (*h*), provides, in relevant part:

"[A] member in service of a retirement system as defined in section one who is a veteran who served in the armed forces of the United States shall be entitled to credit for active service in the armed services of the United States; provided, however, that such active service shall not be credited until such member has paid into the annuity savings fund of such system, in one sum or in installments, upon such terms and conditions as the board may prescribe, makeup payments, for each year of creditable service sought, of an amount equal to . . . ten percent of the regular annual compensation of the member when said member entered the retirement system. . . ."

We accept as reasonable MTRS's view that the makeup payment is designed to compensate MTRS for the return on investment that it could have earned had the member actually contributed to the retirement system during the years of creditable service being purchased. However, in light of the provisions for purchasing creditable service for veterans, we cannot say that the Legislature has, through its employment of the term "makeup payment" in the trade service credit statute, spoken with certainty regarding the date interest begins to accrue.

Based on the language of the majority of creditable service purchase provisions set forth in G. L. c. 32, the Legislature simply chose to be silent on the issue, thereby leaving a policy gap to be filled by agency action. When the Legislature has intended to assess interest on makeup payments that will most closely approximate the value of a member's contributions had the contributions been made at the time of the service being purchased, it has said so explicitly. See, e.g., G. L. c. 32, §§ 3 (4), 3 (4A), 4 (1) ($g^{1/2}$), 4 (1) ($p$), 4 (1) ($r$).[12] In light of the statutory and regulatory context in which the question arises, "the contrast between [the Legislature's] mandate in one context with its silence in another suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion" (emphasis in original). *Cheney R.R. Co.* v. *Interstate Commerce Comm'n*, 902 F.2d 66, 69 (D.C.

---

[12]For example, G. L. c. 32, § 3 (4), governing the purchase of credit for prior teaching experience in public schools outside the Commonwealth, requires a member to

"pay into the annuity savings fund of the system in one sum, or in instalments, upon such terms and conditions as the board may prescribe, an amount equal to that which would have been withheld as regular deductions from his regular compensation for such previous period, or most recent portion thereof, as he may elect, had such service been rendered in a public school of the commonwealth and had he been a member of the teachers' retirement system during the period the service was rendered . . . . *In addition to the payment of such sum or instalments thereof, such member shall also pay into the annuity savings fund an amount of interest such that at the completion of such payments the value of his accumulated payments, together with buyback interest thereon, actually made on account of such previous out-of-state service, shall equal the value of his accumulated buyback deductions which would have resulted if regular deductions had been made when regular compensation for such service was actually received*" (emphasis added).

Cir.), cert. denied, 498 U.S. 985 (1990). See *Chevron, supra* at 843, quoting *Morton* v. *Ruiz*, 415 U.S. 199, 231 (1974) (administrative agency's power to administer congressionally created program "necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress"). See also *Exelon Generation Co.* v. *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 571 (7th Cir. 2012). We therefore view the Legislature's silence here as an invitation to MTRS to fill the gap with appropriate regulation. In any event, whether the language of the trade service credit statute is ambiguous or silent, the result would be the same. See *Goldberg, supra* at 634 ("Statutory silence, like statutory ambiguity, often requires that an agency give clarity to an issue necessarily implicated by the statute but either not addressed by the Legislature or delegated to the superior expertise of agency administrators").

Because the trade service credit statute "neither explicitly forbids nor expressly allows the regulation in question," *Goldberg, supra* at 635, we proceed to consider whether the regulation promulgated by MTRS and approved by PERAC, the agency responsible for overseeing all retirement systems, is a "reasonable resolution of the statute's silence." *Id.* Our review is deferential, and it is therefore "unimportant whether we would have come to the same interpretation of the statute as the agency." *Id.* at 633. "Only an 'agency regulation that is contrary to the plain language of the statute and its underlying purpose may be rejected by the courts.' " *Duarte* v. *Commissioner of Revenue*, 451 Mass. 399, 408 (2008), quoting *Smith* v. *Commissioner of Transitional Assistance*, 431 Mass. 638, 646 (2000). Deference to an agency's interpretation of statutory silence, or ambiguity, is particularly appropriate where, as here, the regulation in question was promulgated immediately after the enactment of the governing legislation. See *Biogen IDEC MA, Inc.* v. *Treasurer & Receiver Gen.*, 454 Mass. 174, 187 (2009), quoting *Connery* v. *Commissioner of Correction*, 414 Mass. 1009, 1010 (1993) (interpretation made close to time Legislature enacted statute is entitled to "heightened" deference because it "may represent 'understanding of the public regarding the enactment' ").

Applying this deferential standard of review, we conclude

that 807 Code Mass. Regs. § 14.05 is a reasonable resolution of the Legislature's silence or ambiguity on the issue of interest accrual in G. L. c. 32, § 4 (1) ($h^{1}/_{2}$). The regulation reflects a determination that buyback interest should approximate as closely as possible the return on investment that MTRS could have earned had the member actually contributed to the retirement system during the years of creditable service being purchased.[13] Cf. *State Bd. of Retirement* v. *Contributory Retirement Appeal Bd.*, 342 Mass. 58, 60 (1961) (retirement board has obligation to protect financial integrity of retirement system). This policy determination by MTRS is consistent with other statutes concerning creditable service purchases for teachers, which charge buyback interest as of the date of service purchased. See G. L. c. 32, §§ 3 (4), 3 (4A), 4 (1) ($g^{1}/_{2}$), 4 (1) (*p*), 4 (1) (*r*).

In addition, the record indicates that 807 Code Mass. Regs. § 14.05 was the product of "thoughtful, reasoned deliberation," and not "rash, uninformed rule making." See *Biogen IDEC MA, Inc.* v. *Treasurer & Receiver Gen.*, *supra* at 189. On this basis, as well, we conclude that the regulation is reasonable. Before promulgating 807 Code Mass. Regs. § 14.05, the board considered the costs of charging interest back to the date of service purchased with charging interest back to the most recent date of entry into MTRS membership. The board also examined the cost of creditable service under the proposed regulation compared to similar creditable service purchases in the Commonwealth and in other States.

*Conclusion.* Because 807 Code Mass. Regs. § 14.05 is a valid regulation, CRAB's failure to apply the regulation was an error of law. The matter is remanded to the Superior Court where the judgment affirming CRAB's decision shall be vacated and set aside, and judgment shall enter for MTRS.

*So ordered.*

---

[13] All "buyback interest" is set by statute at one-half the actuarial assumed rate of return on investments, as determined by PERAC. See G. L. c. 32, § 1. Thus, a retirement system cannot recover fully the return on investment that it could have earned had the member made the contributions to the retirement system during the years of creditable service being purchased, rather than just prior to retirement.